UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
KATHLEEN MILLER,                        )
                                        )
                Plaintiff,              )
                                        )
v.                                      )        Civil Action No. 05-30117-KPN
                                        )
VERIZON COMMUNICATIONS INC.,            )
                                        )
                Defendant.              )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Verizon Communications Inc. ("Verizon") and its predecessor, Bell Atlantic, employed Plaintiff Kathleen Miller as a Service Representative from June 1998 until February 2003, when she was terminated for excessive absenteeism. Ms. Miller had an abysmal attendance record throughout her career at Verizon, with an average absence rate of *21 percent*. She contends, however, that her termination resulted not from poor attendance, but from discrimination and retaliation on the part of Verizon because she has diabetes.

Ms. Miller's claims fail on the undisputed facts. As discussed in detail below, Ms. Miller did not have a "disability"; she was not a "qualified individual," even with reasonable accommodations; there is no evidence that Verizon terminated her because of her diabetes (as, indeed, it did not); and there is no evidence that Verizon retaliated in any way against Ms. Miller (again, it did not). In short, Ms. Miller cannot prove any of the essential elements of her claims, and Verizon is entitled to judgment as a matter of law.

## I.     UNDISPUTED FACTS

Verizon incorporates by reference its Statement of Undisputed Facts ("Statement") and accompanying exhibits, which are submitted in accordance with Local Rule 56.1.

## II.     ARGUMENT

To prevail on a claim for disability discrimination under either federal or Massachusetts state law, a plaintiff "must show: (1) that he suffers from a disability; (2) that he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation; and (3) that [the defendant] took adverse action against him because of his disability." *Wright v. CompUSA, Inc.*, 352 F.3d 472, 475 (1st Cir. 2003).[1] On the undisputed facts, Ms. Miller can prove none of these essential elements of her claim.

---

[1] "The analysis of a handicap discrimination claim under Chapter 151B is essentially the same as under the ADA." *See Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 115 F. Supp. 2d 127, 130 (D. Mass. 2000). Therefore,

**A.    Plaintiff is not disabled, as she is not substantially limited in any major life activity.**

In order to be "disabled," a plaintiff must have "a physical or mental impairment which substantially limits one or more major life activities."  42 U.S.C. § 12102(2)(a).  The terms "major life activity" and "substantially limits" must "be interpreted strictly to create a demanding standard for qualifying as disabled."  *Toyota Motor Mfg. of Ky., Inc. v. Williams*, 534 U.S. 184, 196-97 (2002).  It is not enough for a plaintiff simply to present evidence that she has a physical or mental impairment; she is disabled only if she can show that her impairment substantially limited her in a major life activity.  *Id.* at 195.[2]  "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment."  *Id.* at 198.  This is especially true "where the impairment is one whose symptoms vary widely from person to person."  *Id.* at 199.

1.    *Plaintiff is not substantially limited in the major life activity of working.*

In her answers to interrogatories, Ms. Miller identified "work, among other life functions," as the major life activities in which she was substantially limited.  Statement, ¶ 28.  Having never supplemented this interrogatory answer, Ms. Miller should be precluded from relying on major life activities other than working, which requires proof that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(i).  In order to survive summary judgment, Ms. Miller must "offer some evidence from which a reasonable jury could find that she is significantly restricted in her ability to perform a class of jobs or a broad range of jobs in various classes."  *Lebron-Torres v. Whitehall Labs.,* 251 F.3d 236, 240 (1st Cir. 2001).

Verizon will focus its analysis on the ADA.  Where Chapter 151B requires a different analysis, Verizon will address it separately.
[2] Verizon does not dispute that diabetes is a "physical impairment."

Ms. Miller has not come forward with any such evidence.  On the contrary, she has been

employed at the Magic Wings Butterfly Conservatory since April 2003 – a mere two months

after Verizon terminated her employment.  She has been a full-time employee there since

September 2003, and has been the general manager since March 2004.  She works between nine

and 12 hours per day, oversees a staff of 35-40 people, and is responsible for human resources,

advertising, marketing, and event planning, as well as other duties.  Statement, ¶¶ 106-07.  *See,

e.g., Whitney,* 115 F. Supp. 2d at 132 (plaintiff was not substantially limited in major life activity

of working where she obtained continuous employment).  Moreover, Ms. Miller is hard-pressed

to argue that she is limited in the fields that are open to her, since she has an advanced degree in

psychology and worked in the mental health field for 10 years before going to work for Bell

Atlantic.  Statement, ¶ 108.  Given these undisputed facts, Ms. Miller cannot show that she was

substantially limited in the major life activity of working.

2.     *Plaintiff is not substantially limited in any other major life activity.*

Ms. Miller's claim fails even if she is allowed to rely on alleged limitations in major life

activities other than working.  Ms. Miller was hospitalized only twice in four years, neither time

for her diabetes.  *Id.* ¶ 47.  In the year preceding her diabetes diagnosis, she "was incapacitated

much of the time by not feeling well," and "would suffer a lot with just different gastrointestinal

kinds of problems."  *Id.* ¶ 36.  However, there were no activities that Ms. Miller was completely

prevented from doing; she would go grocery shopping, socialize with her friends, occasionally

go to restaurants, and do general housework.  *Id.* ¶¶ 37-38.  She was able to care for herself,

except for three times in a four-year period when her mother needed to come over and help.  *Id.* ¶

39.  By the late Summer or early Fall of 2001, Ms. Miller was usually fully functional by 11:00

in the morning, and by the time Verizon terminated her in February 2003, she "was functioning

very well," was "feeling much better," and was not substantially limited in any of her daily activities. *Id.* ¶¶ 40-41.

Ms. Miller's only dietary restriction was to limit her intake of carbohydrates; otherwise, she could eat a wide variety of good foods. *Id.* ¶ 29.  Her only limitation on sleeping was her need to get eight hours of sleep per night, which she usually managed to do. *Id.* ¶ 30.  Ms. Miller has been able to exercise regularly and to travel reasonable distances and with reasonable frequency. *Id.* ¶ 31-34.  In fact, she took week-long trips to Jamaica and a trip to Maryland between 1999 and 2003. *Id.* ¶ 34.  Ms. Miller claims that she could not spend more than three hours on an airplane, but in fact, before she was diagnosed with diabetes, Ms. Miller had taken only three flights longer than four hours in her entire life. *Id.* ¶ 33(c), 35.

When asked to identify specific activities in which she was limited, Ms. Miller described only minor restrictions on her social life:  she declined a trip to Foxwoods Casino once because she would have to ride in the back seat; she declined an invitation to a chocolate tasting; she had to "seriously consider" whether she could go on a cruise; she avoided going to events "really late at night"; she went to drive-in movies instead of the movie theater; she limited her trips to restaurants; and she limited the amount of time should would spend in malls. *Id.* ¶ 33.  These hardly amount to "substantial limitations" on "major life activities."  If anything, they describe a modest social life characteristic of most working adults.

It may well be that Ms. Miller did not feel well much of the time, but that is not the test under the ADA.  *See, e.g., Scherer v. Potter,* 443 F.3d 916 (7th Cir. 2006) (diabetic plaintiff who could generally function was not substantially limited in a major life activity, even though he had ulcers on both feet, dietary restrictions, intermittent disrupted sleep, reduced sexual drive, and needed insulin injections twice per day).  The ADA imposes the much more rigorous

requirement that a plaintiff be substantially limited in a major life activity.  On the undisputed facts, Ms. Miller falls far short of this requirement.[3]

       3.      *Plaintiff does not have a "handicap" under Chapter 151B.*

M.G.L. Chapter 151B differs from federal practice in that the Massachusetts Supreme Judicial Court, unlike the United States Supreme Court, holds that "mitigating measures" are not to be considered in determining whether an individual is disabled.  *Compare Sutton v. United Airlines, Inc.,* 527 U.S. 471 (1999) (courts must evaluate disability after mitigating measures are taken into account), *with Dahill v. Police Dep't of Boston,* 434 Mass. 233 (2001) (mitigating measures should not be taken into account).  Ms. Miller's claim fails under either methodology.  She has not presented specific evidence concerning the difference, if any, between her medicated and unmedicated states.  However, much of the testimony described in Section 2, *supra,* relates to her condition in the year before she was diagnosed with diabetes – and, consequently, before she was being treated for it.  For the reasons discussed above, that testimony shows that Ms. Miller was not substantially limited in any major life activities, even before she was diagnosed with and treated for diabetes.  Therefore, Ms. Miller's claim fails regardless of whether her treatment is taken into account.

---

[3] It is doubtful that the activities Ms. Miller described even qualify as "major life activities."  *See, e.g., Tebo v. Potter,* 345 F. Supp. 2d 61, 66-67 (D. Mass. 2004) (driving is not a major life activity); *Lemire v. Silva,* 104 F. Supp. 2d 80, (D. Mass. 2000) (traveling is not a major life activity unless it restricts "basic mobility, such as leaving one's home"); *Schultz v. Spraylat Corp.,* 866 F. Supp. 1535 (C.D. Cal. 1994) (under state act, traveling by airplane is not a major life activity); *Rossbach v. City of Miami,* 371 F.3d 1354, 1358 n.6 (11th Cir. 2004) ("weight lifting" and "participating in sport activities" are not major life activities).  While eating may, in the most general sense, be a major life activity, "eating specific types of foods, or eating specific amounts of food, might or might not be a major life activity."  *Fraser v. Goodale,* 342 F.3d 1032, 1040-41 (9th Cir. 2003), *cert. denied,* 541 U.S. 937 (2004).  Finally, while sleeping may be considered a major life activity, *see Cornwell v. Dairy Farmers of America, Inc.,* 369 F. Supp. 2d 87, 16 (D. Mass. 2005), it is clear that Ms. Miller is not substantially limited by her requirement of eight hours of sleep per night.

 BOS_538245_4.DOC/BLAMKIN

**B.    Plaintiff is not a "qualified individual with a disability" because she was unable to appear regularly for work, which was an essential function of her job.**

Even if Ms. Miller did have a "disability," that fact alone would be insufficient to support her claim.  The ADA protects only a "*qualified* individual with a disability," defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8) (emphasis added).  *See also id.* § 12112(a) ("No covered entity shall discriminate against a *qualified* individual with a disability because of the disability of such individual.") (emphasis added).  As the undisputed facts demonstrate, however, Ms. Miller was not "qualified" for the Service Representative position because she was demonstrably incapable of regular attendance – an essential function of that position.

1.    *Regular attendance is an essential function of the Service Representative position.*

The First Circuit has not directly addressed the question of whether regular attendance is an essential job function, but has stated that "a regular and reliable schedule may be an essential element of most jobs," and that "resolution of the issue in each case requires a fact-intensive inquiry into the pattern of the attendance problem and the characteristics of the job in question." *Ward v. Massachusetts Health Research Institute, Inc.,* 209 F.3d 29, 35 (1st Cir. 2000).[4]  Many other circuits, however, have squarely addressed this issue and have concluded that regular attendance *is* an essential job function.  *See, e.g., Schierhoff v. GlaxoSmithKline Consumer HealthCare, L.P.,* 444 F.3d 961, 966 (8th Cir. 2006); *Brenneman v. MedCentral Health Sys.,* 366 F.3d 412, 418 (6th Cir. 2004); *Mason v. Avaya Communications, Inc.,* 357 F.3d 1114, 1122 (10th Cir. 2004); *Spangler v. Federal Home Loan Bank of Des Moines,* 278 F.3d 847, 850 (8th Cir. 2002); *EEOC v. Yellow Freight Sys., Inc.,* 253 F.3d 943, 949 (7th Cir. 2001); *Tyndall v. National*

---

[4] In *Ward,* the issue was tardiness, not, as it is here, excessive absenteeism.  Therefore, the question of "regular attendance," as opposed to "timely attendance," was not before the court.

*Educ. Ctrs., Inc.,* 31 F.3d 209, 213 (4th Cir. 1994).  One court observed:  "[L]et us be clear that our court, and every circuit that has addressed this issue, has held that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are the result of a disability.  The fact is that in most cases, attendance at the job site is a basic requirement of most jobs."  *Yellow Freight,* 253 F.3d at 948.

The substantial weight of authority holds that regular attendance is an essential function of most jobs.  Moreover, on the undisputed facts, there is no question that regular, predictable attendance is an essential function of the Service Representative position.  The requirements of that position are set out in a written Job Brief.  Some of those requirements include: "Handles large volumes of telephone calls, and may handle face-to-face customer contacts," and, "Uses video display terminals to gain access to various computer systems used to negotiate all types of customer and intra-company contacts."  The Job Brief also explains that Service Representatives spend "long periods of time communicating with customers and others by telephone," and emphasizes the importance of regular attendance and the periodic need to work evening, weekend, and holiday shifts, as well as overtime.  Statement, ¶¶ 14-18.  *See also Ward,* 209 F.3d at 34 (1st Cir. 2000) (courts "generally give substantial weight to the employer's view of job requirements in the absence of evidence of discriminatory animus.").[5]

A Service Representative's primary responsibility is to answer incoming calls from Verizon customers with questions about their phone service.  Service Representatives work in call centers using Verizon equipment, including the computer systems necessary to process customer requests and orders.  On average, a Service Representative handles 50 to 70 calls per day.  It would be impossible for a Service Representative to work from home, and none ever have been allowed to do so.  *Id.* ¶¶ 4-7, 13.

---

[5] As argued below, there is no evidence of discriminatory animus on the undisputed facts.

In addition, Verizon is subject to extensive government regulation. Among those regulations is a requirement that Verizon respond to 80 percent of customer service calls within 20 seconds. Failure to meet this standard can result in fines and, eventually, the loss of required licenses. Verizon has strict requirements for Service Representatives' interactions with customers, which they have in front of them either in a word-for-word script or in a matrix directing the representative to the proper information. Verizon carefully monitors its Service Representatives, including randomly listening in on calls and providing feedback. *Id.* ¶¶ 8-9, 19.

For all of these reasons, it is essential that Service Representatives show up for work as scheduled. If a Service Representative is not present as scheduled, Verizon can lose calls, and, consequently, business. Verizon does not have the capability of calling in a replacement Service Representative if someone does not show up for work, and if a Service Representative is absent, other Service Representatives must take on more calls. *Id.* ¶¶ 10-12. In short, it is beyond dispute that regular, predictable attendance is an essential function of the Service Representative position.

> 2.    *Plaintiff could not perform the essential job function of regular attendance.*

Ms. Miller clearly was incapable of regular attendance, as demonstrated by her attendance record throughout her employment at Verizon. Not including vacations (which she took regularly in addition to her other absences), Ms. Miller was absent on 25 days in 1999, 45 days in 2000, 65 days in 2001, and 34 days in 2002, for a total of ***169 days in four years***. Statement, ¶¶ 48-51, 70. Assuming a normal work year of approximately 250 days, that means Ms. Miller was absent approximately 10 percent of the time in 1999, 18 percent of the time in 2000, 26 percent of the time in 2001, and 14 percent of the time in 2002, ***for an average absence rate of 17 percent.*** Factoring in Ms. Miller's 10 days of vacation per year, the percentages

increase to 14, 22, 30, and 18 percent, respectively, *or an average absence rate for the four-year period of 21 percent*.  *Id.* ¶¶ 48-54.

By any measure, these undisputed facts show that Ms. Miller was incapable of meeting the attendance requirements of her position.  *Brenneman v. MedCentral Health System,* 366 F.3d 412 (6th Cir. 2004), is particularly instructive.  The plaintiff, a diabetic, had what the court characterized as "substantial attendance deficiencies."  *Id.*  Specifically, "plaintiff had 193 unapproved absences and 34 late arrivals or early departures during his employment," and "[t]hese attendance deficiencies chiefly related to medical problems other than plaintiff's diabetes, such as six work-related injuries and other general illnesses."  *Id.*  The plaintiff "received a number of verbal and written warnings and suspensions" pursuant to the defendant's progressive discipline policy.  *Id.*  After several years of these absences, the plaintiff reached a disciplinary level where additional absences would, and did, result in his termination.  *Id.*

The court held that the plaintiff's poor attendance history rendered him unqualified for his position of pharmacy technician.  *Id.* at 418.  The court found that regular attendance was an essential function of the position, which involved duties such as stocking medications and delivering them to patients in the hospital (where the pharmacy was located) that could not be performed away from the job site.  The court also found that the plaintiff's absenteeism caused the defendant to attempt to call in other pharmacy technicians to cover for the plaintiff or to distribute the plaintiff's duties among the remaining staff.  Finally, the court found the plaintiff's attendance record to be so poor that an accommodation of additional time off would not have enabled him to perform the essential job function of regular attendance.  *Id.* at 418-20.

The facts of the present case are remarkably similar to *Brenneman,* and Verizon respectfully submits that this Court should reach the same result.  Ms. Miller's attendance was

woefully inadequate and (as discussed below) could not have been improved sufficiently with a reasonable accommodation.  She is not, therefore, a "qualified individual," and her claims under the ADA and Chapter 151B fail.  *See also Yellow Freight,* 253 F.3d at 946, 950 (plaintiff with more than 200 absences over four years could not perform essential function of attendance).

> 3.    *No reasonable accommodation would have enabled Plaintiff to fulfill the essential job function of regular attendance.*

Ms. Miller was neither "disabled" nor "qualified," and hence not entitled to a reasonable accommodation.  Even if Ms. Miller were entitled to a reasonable accommodation, however, the undisputed facts show that Verizon did accommodate her through the lenient application of its progressive discipline policy; that the two accommodations Ms. Miller allegedly proposed were not reasonable; and that Ms. Miller refused to cooperate with Verizon's efforts to explore possible accommodations.[6]

### (a)    Verizon did accommodate Ms. Miller.

Even though Verizon contends it had no obligation to provide Ms. Miller a reasonable accommodation, it did so through the extremely lenient application of its disciplinary policy pertaining to attendance.  Ms. Miller's poor attendance began long before she was diagnosed with diabetes, and even after that diagnosis, the reasons that Ms. Miller gave for her absences generally were unrelated to diabetes.  Ms. Miller explained many of her absences with reasons as varied as a pulmonary embolism or torn muscle, sore ribs, a problem with her glands, the flu, upset stomachs, migraines, a contagious parasite contracted on vacation, a back injury from falling down stairs, strep throat, sinus problems, and an ovarian cyst.  Beginning in the Summer of 1999, after she had been employed at Verizon for one year, Ms. Miller sought and was granted

---

[6] Verizon contends that Ms. Miller never asked for a reasonable accommodation and, in fact, never properly advised Verizon that she claimed to be disabled because of her diabetes.  However, Verizon recognizes there is a dispute of fact on these points.  Therefore, Verizon will assume, for purposes of this summary judgment motion only, that Ms. Miller did advise Verizon of her alleged disability and need for a reasonable accommodation.

BOS_538245_4.DOC/BLAMKIN

numerous FMLA-qualified absences.  Eventually, however, she had been absent so frequently that she could no longer meet the 1,250-hour threshold for FMLA eligibility.  Statement, ¶¶ 52-57, 62, 69.

Ms. Miller was subject to Verizon's written Attendance Guidelines (the "Guidelines"). The Guidelines emphasize the importance of regular attendance.  Pursuant to the Guidelines and company practice, employees who do not maintain good and regular attendance are given a series of warnings, verbal then written, followed by a series of suspensions and ultimately, should attendance not improve, by termination of employment.  Once employees are placed on written warning, subsequent absences occurring within set periods of time commonly result in a series of three suspensions, increasing in length from one to five, five to 10, and then 30 days. Employees are commonly placed on "Final Warning" upon their return from a 30-day suspension for poor attendance.  An employee on Final Warning is subject to immediate termination should she repeat an unapproved absence within one year.  *Id.* ¶¶ 20-25.

It is undisputed that Verizon never disciplined Ms. Miller for her FMLA-approved absences.  Moreover, Verizon reduced at least one written warning to a verbal warning, reduced the length of at least one suspension, and let several absences slide with no disciplinary action, even when Verizon would have been entitled to suspend her.  When Verizon did suspend her (on multiple occasions), the suspensions often were shorter than the attendance policy would have permitted.  In fact, after Verizon gave Ms. Miller a final warning in August 2002, following several suspensions, she was absent ***11 more times*** before Verizon finally terminated her employment.  *Id.* ¶¶ 60-69, 71-72.  Even Ms. Miller's union representative acknowledged Verizon's leniency, and went so far as to comment that Verizon had "bent over backwards to help her."  *Id.* ¶¶ 73-76.

BOS_538245_4.DOC/BLAMKIN

In short, while Verizon was under no obligation to modify its disciplinary procedures, it nevertheless did so in an effort to assist Ms. Miller in managing her attendance. Its leniency in disciplining Ms. Miller was more than reasonable, and satisfied any obligation Verizon might have had to provide a reasonable accommodation.

### (b)    Plaintiff's proposed accommodations were unreasonable.

Ms. Miller claims that she asked for two different accommodations for her diabetes: coming to work late, and using vacation and personal time in lieu of sick time. Specifically, Ms. Miller claims that in August or September of 2001, she asked one of her managers if she could come to work two hours late on those mornings that she was feeling ill. At the time Ms. Miller allegedly sought this accommodation, her normal work hours were from 9:00 a.m. to 6:00 p.m. Although the office was not open past 6:00 p.m., and Ms. Miller was asking to come in at 11:00 a.m., she never discussed whether or how she would make up those two hours, nor did she provide any details about how long a period of time she believed she would need to come in late to work. As to her proposed use of vacation or personal time, Ms. Miller made this request on one occasion, and her request was to retroactively designate an unexcused absence she already had taken as vacation time to avoid moving to the next level of discipline. She did *not* ask to use vacation time prospectively for future absences. Statement, ¶¶ 84-89, 94.

An employer is not required to provide the specific accommodation that an employee requests. An employer's only obligation is to offer a *reasonable* accommodation to a qualified disabled employee who requests one. *Bryant v. Caritas Norwood Hosp.,* 345 F. Supp. 2d 155, 169 (D. Mass. 2004). Even assuming that Ms. Miller asked for these accommodations, they are not reasonable and Verizon was under no obligation to grant them. As to her request to come in late, Ms. Miller never specified how long she would require this accommodation, nor with what

frequency or on what schedule.  Ms. Miller's attendance history was characterized by its

unpredictability, so that, in effect, her requested accommodation amounted to a request to set her

own schedule and come in late whenever she felt like it.  An employer's duty to provide a

reasonable accommodation does not extend that far.  *See, e.g., Amadio v. Ford Motor Co.,* 238

F.3d 919, 928 (7th Cir. 2001) (employer is not required to provide an "open-ended schedule that

allows the employee to come and go as he pleases"); *Hibbler v. Regional Med. Ctr. at Memphis,*

12 Fed. Appx. 336, 339 (6th Cir. 2001) (employer "was not required to overlook or

accommodate frequent unscheduled – and unapproved – absences" for employee who regularly

came in one hour late).

     Ms. Miller's unpredictable schedule also would have required other Service

Representatives to take on an increased workload, since Verizon did not have the ability to call

in temporary replacement representatives.  Requiring other employees to shoulder a disabled

employee's workload is not, however, a reasonable accommodation.  *See Feliciano v. State of*

*Rhode Island,* 160 F.3d 780, 785 (1st Cir. 1998) ("The ADA does not require an employer to

accommodate a disability by foregoing an essential function of the position or by reallocating

essential functions to make other workers' jobs more onerous.").

     Ms. Miller's retroactive request to use vacation time fares no better.  On one occasion in

January 2003, she asked her supervisor to alter Verizon's time records to make it appear that a

prior unexcused absence actually was a vacation day, thereby lowering her "step" in the

disciplinary process.  Statement, ¶ 94.  At that point, Ms. Miller was facing termination as a

result of her numerous unexcused absences after she was put on a Final Warning.  Far from

being a request for a reasonable accommodation, this was a request that her manager falsify time

records.  Such falsification would be a violation of Verizon's Code of Business Conduct, which

requires employees to "prepare company records completely, accurately, and truthfully," to "not knowingly prepare, maintain or provide false or misleading records or data."  Miscoding time could also run afoul of the Collective Bargaining Agreement ("CBA"), and has potential ramifications under OSHA and ERISA, as well.  *Id.* ¶ 95.  Moreover, the ADA does not require employers to waive or modify previously imposed discipline as a reasonable accommodation. *See Siefken v. Village of Arlington Heights,* 65 F.3d 664, 666-67 (7th Cir. 1995) (police department was not required to give "second chance" to diabetic police officer who violated safety rules during severe hypoglycemic reaction); *Davila v. Qwest Corp.,* 113 Fed. Appx. 849, 854 (10th Cir. 2004) ("[A]s many cases have recognized in various contexts, excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA.") (collecting cases).

Even if Ms. Miller had asked to use vacation time for *future* absences, that would not have been a reasonable accommodation.  Given Ms. Miller's spotty and unpredictable attendance, that request was equivalent to a request for an open-ended schedule.  As discussed above, such a request is unreasonable.  Furthermore, Verizon employees' use of vacation time is subject to the terms of the CBA.  Among other provisions, the CBA states that vacation time is not to be used for illness-related absences.  The CBA also governs how vacation days are assigned and taken, including vacation used on a "day-at-a-time" basis.  Not surprisingly, seniority (of which Ms. Miller had relatively little) is one of the factors.  Statement, ¶¶ 90-93. Allowing Ms. Miller to take vacation days whenever she wanted to could have infringed on the rights of other, more senior employees.  The Supreme Court has made clear, however, that an accommodation is almost never reasonable if it requires the employer to violate the terms of a

collective bargaining agreement.  *US Airways, Inc. v. Barnett,* 535 U.S. 391, 405 (2002) (absent

plaintiff's showing of "special circumstances," violation of seniority rules is sufficient to make a

requested accommodation unreasonable).  *Cf. Feliciano,* 160 F.3d at 787 ("[A]n employer is not

required to violate the provisions of a collective bargaining agreement or the rights of other

employees in seeking [a job] reassignment.")

Finally, using vacation time would not have enabled Ms. Miller to achieve regular

attendance, since she used all of her vacation time every year ***in addition to all of her illness-

related absences.***  Statement, ¶ 70.  Using her 10 vacation days would have done nothing to

improve her attendance; it simply would put a different label on a few of her excessive absences.

Under these circumstances, a request to use vacation time for illness-related absences would

have equated to a request for an exemption from Verizon's attendance and discipline policies,

not a request for an accommodation allowing her to perform the essential functions of the job.

As argued above, the ADA does not require an employer to honor such a request.

      **(c)**      **Plaintiff refused to cooperate with Verizon's efforts to accommodate her, precluding a finding that Verizon denied her a reasonable accommodation.**

In addition to showing Ms. Miller substantial leniency in its progressive discipline,

Verizon repeatedly encouraged her to take advantage of its Employee Assistance Program

("EAP"), which (among other services) commonly provides assessment and referral services for

employees whose medical condition may impact their ability to provide regular attendance.

Verizon recommended the EAP to Ms. Miller on at least seven different occasions.  Finally, on

January 31, 2002, with the assent of the union, Verizon required ("job assigned") Ms. Miller to

consult with the EAP in exchange for reducing a 30-day suspension to 20 days.  Despite these

repeated attempts to assist Ms. Miller, she steadfastly refused to contact the EAP.  *Id.* ¶¶ 78-83.

- 15 -

By referring Ms. Miller to the EAP, Verizon was attempting to engage in an "interactive process" with her to find a reasonable accommodation.  *See Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 108 (1st Cir. 2005) ("The ADA's regulations state that 'it may be necessary for the covered entity [the employer] to initiate an informal, interactive process with the qualified individual [the employee] with a disability in need of the accommodation.'").[7]  This is not a one-way process.  The employee has an equal obligation to participate, and her failure to do so "preclude[s] a finding that [the employer] failed to reasonably accommodate her."  *Bryant,* 345 F. Supp. 2d at 169-70.  *See also EEOC v. Sears, Roebuck & Co.,* 417 F.3d 789, 806 (7th Cir. 2005) ("[W]hen an employer takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate or withholds essential information.").[8]  Furthermore, "[w]hen a plaintiff employee rejects a reasonable accommodation offered by her employer … she is precluded from recovering under the ADA for her employer's alleged failure to provide a reasonable accommodation."  *Bryant,* 345 F. Supp. 2d at 168.

Verizon referred Ms. Miller to the EAP precisely because of that group's expertise in helping employees find solutions to problems affecting their work, including medical issues.  Her refusal even to speak with the EAP constitutes a failure to participate in the interactive process that precludes her claim.

**C.**     **Plaintiff cannot show that she was discharged because of her diabetes.**

Even if Ms. Miller could show that she was a "qualified individual with a disability," she cannot show that Verizon terminated her because of her alleged disability (which it most

---

[7] Whether Chapter 151B requires an interactive process is unclear.  *Compare Tobin,* 433 F.3d at 108 n.8 ("State law imposes a similar requirement to engage in an 'interactive process.'") (citing *Russell v. Cooley Dickinson Hosp., Inc.,* 437 Mass. 443 (2002)), *with Mammone v. President & Fellows of Harvard College,* 446 Mass. 657, at *14 (2006) (Greaney, J., dissenting) ("We have never held that G.L. c. 151B requires an employer to initiate an interactive process to reach a reasonable accommodation for a handicapped employee.") (citing *Sullivan v. Raytheon Co.,* 262 F.3d 41, 47-48 (1st Cir. 2001)).

[8] Ms. Miller did not even make the effort to speak with any of her doctors about possible accommodations in the workplace.  Statement, ¶ 96.

certainly did not do).  Ms. Miller's attendance was unacceptable throughout her employment at Verizon, including at least a year before she was diagnosed with diabetes.  Statement, Exhs. I, K.  Verizon never disciplined Ms. Miller for absences that she represented were related to her diabetes, and was consistently lenient in its application of progressive discipline, allowing Ms. Miller to remain employed for more than four years under circumstances that easily would have justified her termination.  Had Verizon been motivated by a discriminatory animus, it had ample opportunity to terminate Ms. Miller far earlier than it did.

Against this substantial evidence, Ms. Miller sets only two contentions.  First, she alleges that "[t]he management of the Defendant made statements that led the Plaintiff to believe that her requests for leave for her handicap and disability upset them."  Complaint, ¶ 13.  However, when pressed for the details of this allegation, Ms. Miller identified only one individual, Hans Peterson, who allegedly made these statements, and the only statements she identified were "comments to the effect of me being 'an ongoing attendance problem for years' and that I 'could have used vacation time when I went home but chose sick time instead.'"  Statement, ¶ 97.  Ms. Miller also admitted that she never even heard these alleged statements herself, claiming instead that Mr. Peterson made the statements to a union representative, who then repeated them to Ms. Miller.  *Id.* ¶ 98.  In fact, no one at Verizon said anything to Ms. Miller suggesting they thought she was handicapped or disabled.  *Id.* ¶ 99.

Apart from being inadmissible hearsay, these alleged statements do not even remotely evidence discriminatory animus.  Ms. Miller did, in fact, have "an ongoing attendance problem for years."  Additionally, while Ms. Miller would not actually have been permitted to substitute vacation time for sick time, Mr. Peterson's alleged statement to that effect merely reflects the reality that Ms. Miller made a regular practice of taking all of her vacation time every year,

regardless of the number of unexcused absences she accumulated.  Even if these statements somehow could be construed as discriminatory, they are no more than isolated "stray remarks" that are wholly insufficient to establish the requisite discriminatory animus.  *See Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002) ("'[S]tray workplace remarks' … normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.").

Ms. Miller also claims that she "felt more like if I did call out, maybe it wasn't – maybe they weren't believing that I was out sick.  It was a feeling like that rather than someone stating to me, You're out too much."  She based this feeling on alleged statements by one of her managers, Sally Sullivan, "like, Are you sure you're sick; are you sure you can't come in, things like that that just gave me the impression that they were doubting me, when I was more than willing if I was well, to come in and do everything that was expected of me."  Statement, ¶ 100.  Beliefs and feelings, however, cannot support a claim of discrimination.  *See Ruiz v. Posadas de San Juan Assoc.*, 124 F.3d 243, 248-49 (1st Cir. 1997) (plaintiff's subjective belief that articulated reasons for termination were pretextual is insufficient to state claim for discriminatory termination).

**D.    <u>Plaintiff cannot show that Verizon retaliated against her.</u>**

Finally, Ms. Miller claims that Verizon retaliated against her for taking time off and for requesting reasonable accommodations.  To state a *prima facie* case of retaliation under the ADA, "a plaintiff must prove that (1) she engaged in protected conduct, (2) she suffered an adverse employment action and (3) a causal connection exists between the two."  *Gore v. Trustees of Deerfield Academy,* 385 F. Supp. 2d 65, 70 (D. Mass. 2005) (citing *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477-78 (1st Cir. 2003)).  For purposes of this summary judgment motion, Verizon will assume that Ms. Miller engaged in protected activity, since there is a

dispute of fact as to whether she requested reasonable accommodations.  However, Ms. Miller cannot prove that she suffered an adverse employment action, or if she did, that there was any connection between that action and any protected activity.

>    1.    *Plaintiff did not suffer an adverse employment action.*

Ms. Miller does *not* claim that her termination was retaliatory.  She claims only that "my work was more closely scrutinized and unduly criticized by management in the approximately three months preceding my termination of employment."  Statement, ¶¶ 101-02.  The only fact of which Ms. Miller is aware to support this claim is the alleged "absolute increase in the observations of my telephone calls."  *Id.* ¶ 103.  Despite this supposedly increased scrutiny, Ms. Miller was called into meetings with management only four or five times in the entire year before her termination (most of which predated the alleged scrutiny, which Ms. Miller claims took place in the last three months of her employment).  *Id.* ¶ 104.  Ms. Miller admits that she was never disciplined as a result of this alleged scrutiny.  *Id.* ¶ 105.  Moreover, as her termination letter makes clear, job performance (other than attendance) was not the basis for her termination. *Id.* ¶ 71.

This court repeatedly has held that claims of heightened scrutiny are not adverse employment actions.  In *Cornwell v. Dairy Farmers of America, Inc.,* 369 F. Supp. 2d 87 (D. Mass. 2005), the plaintiff claimed retaliation because he "was subjected to strict reviews and oversight."  *Id.* at 107.  The court rejected that argument, finding that "[s]uch scrutiny does not constitute adverse employment action which is one that imposes a 'change in working conditions that materially disadvantage an employee.'"  *Id.* (citation omitted).  Similarly, in *Flanagan-Uusitalo v. D.T. Indus., Inc.,* 190 F. Supp. 2d 105 (D. Mass. 2001), the court found insufficient

the plaintiff's claims that the defendant excessively scrutinized both her work and her request for short-term disability leave.  *Id.* at 117.

Ms. Miller's claims fail for the same reason.  Even if her allegations of increased scrutiny were true (and they are not), that would not demonstrate any change in working conditions that materially disadvantaged her.  Indeed, Ms. Miller has admitted that she was never disciplined as a result of this alleged scrutiny.

> 2.   *There is no causal connection between the alleged scrutiny and Plaintiff's alleged protected activity.*

Even if this alleged scrutiny did amount to an adverse employment action, Ms. Miller has no evidence linking that scrutiny with her diabetes-related absences or her alleged requests for a reasonable accommodation.  She contends that this heightened scrutiny took place in the last three months of her employment.  By that time, however, her ongoing absences had been a problem for years.  Furthermore, of the two accommodations she claims to have asked for, only one – the retroactive use of vacation time – occurred in the final three months of her employment, when she claims the heightened scrutiny was occurring.  By that time, Ms. Miller had been disciplined regularly for years because of her attendance, and was subject to termination for absences following her Final Warning.  To suggest that Verizon chose heightened scrutiny of her work, with *no disciplinary consequences*, as a mechanism for retaliation, when she *had been disciplined for absenteeism* throughout her employment, is simply untenable.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, Verizon respectfully requests that the Court enter summary judgment in its favor on all counts of the Complaint and award Verizon the costs of this action.

VERIZON COMMUNICATIONS, INC.,
By its attorneys,

/s/ Timothy P. Van Dyck
Timothy P. Van Dyck (BBO #548347)
Windy L. Rosebush (BBO #636962)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100
(617) 227-4420 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 25, 2006, and that there are no non-registered participants.

/s/ Timothy P. Van Dyck
Timothy P. Van Dyck (BBO #548347)