UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

KATHLEEN MILLER,                          )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )          Civil Action No. 05-30117-KPN
                                          )
VERIZON COMMUNICATIONS INC.,              )
                                          )
                    Defendant.            )
_____)


**<u>DEFENDANT'S STATEMENT OF UNDISPUTED FACTS</u>**

Defendant Verizon Communications Inc. ("Verizon"), by and through its undersigned attorneys, submits this Statement of Undisputed Facts ("Defendant's Statement") pursuant to Local Rule 56.1. Where Verizon states what Plaintiff has alleged, Verizon presents those allegations as undisputed because it will assume them to be true, but legally insufficient, for the purposes of its Motion for Summary Judgment. Verizon does not concede Plaintiff's allegations on the merits.

A.    **THE CUSTOMER SERVICE REPRESENTATIVE POSITION**

1.    Verizon's predecessor, Bell Atlantic, hired Plaintiff Kathleen Miller ("Ms. Miller") in June 1998 as a Service Representative. [Deposition of Kathleen Miller ("Miller Depo."), at 36:10-19; 38:11-17.][1]

2.    Ms. Miller was employed as a Service Representative from June 1998 until February 11, 2003, when Verizon terminated her employment. [Miller Depo., at 36:10-19.]

3.    Throughout her employment at Bell Atlantic and Verizon, Ms. Miller was a member of a labor union, the Communications Workers of America. [Miller Depo., at 61:8-14.]

4.    Service Representatives are non-management employees who work under the direct supervision of management employees. They use Verizon equipment located at Verizon facilities to communicate with Verizon customers and take or process customer service orders. [Affidavit of Paula Raposa ("Raposa Aff."), ¶ 2.][2]

5.    Ms. Miller described the duties and responsibilities of the Service Representative position as follows: "To handle the onslaught of incoming calls into the customer service center. Primarily responsible for resolving issues customers might have regarding their phone, whether it's getting them to repair for an issue or getting them to billing for an issue, installing new phone

---

[1]    Referenced portions of the Miller deposition are attached hereto as Exhibit A.
[2]    The Raposa Affidavit, a copy of which is attached hereto as Exhibit B, was previously submitted to the MCAD in connection with Ms. Miller's Charge of Discrimination, which preceded the present action.

service for them, moving service, if they're moving, discussing all the options available.  I'd say that was pretty much it in general."  [Miller Depo., at 43:15 to 44:4.]

6.      The basic responsibilities of a Service Representative are "to be there every day as scheduled, to help handle … customers' questions.  Also to help with any of their needs, so to provide customer service and sales needs to them.  That involved using the computer, having the knowledge and being engaged on the phone with [the] customers to insure a long term relationship with [the] customers."  [Deposition of Paul Raposa ("Raposa Depo."), at 22:18 to 23:5.][3]

7.      When she worked a full day, Ms. Miller handled, on average, 50 to 70 customer calls per day.  [Miller Depo., at 44:5 to 46:10.]

8.      Government regulations require Verizon to respond to 80% of customer calls within 20 seconds.  Should the company fail to meet this service requirement, it faces possible fines and, eventually, potential loss of required licenses.  Such regulatory requirements are additional reasons that attendance is a critical element of the Service Representative position. [Raposa Aff., ¶ 3.]

9.      Verizon has strict requirements for Service Representatives' interactions with customers.  Service Representatives have these requirements in front of them either in a word-for-word script, or in a matrix directing the representative to the proper information.  [Miller Depo., at 44:11 to 45:2.]

10.     Attendance is an essential requirement of the Service Representative position. Service Representatives work in inbound calling centers and must be present to take the calls.  If Service Representatives are not present, Verizon can lose calls, and, consequently, business.

---

[3]        Referenced portions of the Raposa Deposition are attached hereto as Exhibit C.

[Deposition of Mary Ellen Wood ("Wood Depo."), at 67:24 to 68:6.; Deposition of Paul

McGovern ("McGovern Depo."), at 156:7 to 157:15.][4]

11.    Verizon does not have the capability of calling in a replacement Service

Representative if someone does not show up for work as scheduled.  [Wood Depo., at 68:7-12.]

12.    If a Service Representative is absent, other Service Representatives must take on

more calls.  [Miller Depo., at 70:9-16.]

13.    Verizon has never had Service Representatives that worked from home.  [Raposa

Depo., at 22:6-10; McGovern Depo., at 47:8-12.]

14.    Attached hereto as Exhibit F is a copy of Verizon's written job description,

known as a "Job Brief," for the Service Representative position.  Among other things, the Job

Brief sets out the essential duties and skills of the Service Representative position.  [Miller

Depo., at 41:11 to 42:12.]

15.    The Service Representative position requires a "[s]atisfactory attendance record in

[the employee's] present job."  [Job Brief, p. 2; Raposa Aff., ¶ 2.]

16.    Service Representatives "[m]ay be required to work day, evening and weekend

shifts, and overtime and holidays as assigned."  Ms. Miller understood this was a requirement of

the position.  [Job Brief, at VER0054; Miller Depo., at 43:9-14.]

17.    The Job Brief lists the following as some of the "Essential Duties/Skills" of the

Service Representative:  "Handles large volumes of telephone calls, and may handle face-to-face

customer contacts.";  "Uses video display terminals to gain access to various computer systems

used to negotiate all types of customer and intra-company contacts."  [Job Brief, at VER0053,

nos. 6, 11.]

---

[4]    Referenced portions of the Wood Deposition are attached hereto as Exhibit D.  Referenced portions of the
McGovern Deposition are attached hereto as Exhibit E.

BOS_536367_2.DOC/BLAMKIN

18.     The Job Brief also notes that Service Representatives spend "long periods of time communicating with customers and others by telephone."  [Job Brief, at VER0055, no 2.]

19.     Service Representatives are monitored extensively by their supervisors.  This monitoring takes the form of both remote and side-by-side observation pursuant to an observation agreement with the union.  In remote observation, supervisors listen in on a Service Representative's calls from another room, and later provide feedback to the Service Representative.  [Miller Depo., at 45:3-15.]

**B.     VERIZON'S ATTENDANCE POLICY**

20.     Verizon employees are subject to written Attendance Guidelines.  In Ms. Miller's region, these are the "Bell Atlantic North Guidelines, Attendance – New England" ("Attendance Guidelines").  Relevant portions of the Guidelines are attached hereto as Exhibit G.

21.     These Guidelines have been in effect since at least 1995 (when NYNEX, which later became Bell Atlantic, was formed), and have not been changed in that time.  [McGovern Depo., at 136:21 to 137:12; 138:14 to 139:13.]

22.     Ms. Miller was aware of Verizon's attendance policy as set out in the Attendance Guidelines, which she reviewed.  The Attendance Guidelines were included in Ms. Miller's employee handbook when she started her employment at Bell Atlantic.  [Miller Depo., at 38:5 to 39:1.]

23.     The Attendance Guidelines states that "[i]t is essential … to efficient operation that all employees meet the highest possible standards of attendance."  [Attendance Guidelines, at 1.]

24.     The Attendance Guidelines further provide that "[t]he Company has a right to expect and receive an acceptable level of productive attendance from each employee.  Although

BOS_536367_2.DOC/BLAMKIN

the Company may be patient and forbearing with extraordinary bona fide illnesses or personal problems, it has a right to take appropriate steps to obtain an acceptable level of productive attendance.  If this is not possible, separation is the only alternative."  [Attendance Guidelines, at 1.]

25.     Employees who do not maintain good attendance are given a series of warnings, verbal then written, followed by a series of suspensions and ultimately, should attendance not improve, termination of employment.  Discipline increases in severity should absenteeism recur within set time frames, called "retrogression periods," ranging from several months to a year from the date of the last discipline.  Once employees are placed on written warnings, subsequent absences occurring within the retrogression period commonly result in suspensions of one to five, five to 10, and 30 days.  Employees are commonly placed on "Final Warning" upon return from a 30-day suspension for poor attendance.  An employee on Final Warning is subject to termination should she repeat an unapproved absence within one year.  [Raposa Aff., ¶ 4; Raposa Depo., at 83:19 to 84:15; 101:7-16.]

26.     Verizon has an automated 800 number for employees to request FMLA leave.  If an employee is ill and cannot report to work, she can call the 800 number to begin the process for FMLA review.  She would then call her manager to advise her manager of the absence.  [Miller Depo., at 126:10 to 127:9.]

C.     **PLAINTIFF'S DIABETES**

27.     Ms. Miller was first diagnosed with diabetes in February 2000.  [Miller Depo., at 21:9-11.]

28.    "Work" is the only major life activity that Ms. Miller has specifically identified as being substantially limited.  [Plaintiff's Answer to Defendant's First Set of Interrogatories, Int. No. 16.][5]

29.    While Ms. Miller must limit (but not eliminate entirely) her intake of foods with high carbohydrates, she still has a wide variety of foods she can eat and has "good choices of what [she] can pick."  She has been very successful with her diet modifications.  [Miller Depo., at 77:19 to 79:17.]

30.    Ms. Miller needs about eight hours of sleep per night.  She tries to go to bed around 9:30 p.m., and usually gets up between 6:30 a.m. and 7:30 a.m.  [Miller Depo., at 79:23 to 80:16.]

31.    Ms. Miller exercises regularly.  She does "a lot of walking," and sometimes uses a treadmill, stair stepper, or ab roller.  She tries to squeeze exercise into her daily routine by parking further away from the office or taking stairs instead of an elevator.  [Miller Depo., at 83:1 to 84:6.]

32.    Except for occasional mornings, Ms. Miller has had no difficulty driving, and, in fact, prefers driving to riding as a passenger in a car.  [Miller Depo., at 31:2 to 32:4.]

33.    When asked at her deposition to identify activities in which she was limited, Ms. Miller identified the following:

a.    She declined a trip to Foxwoods Casino with her friends because she would have to ride in the back seat.  [Miller Depo., at 90:8-14.]

b.    She turned down an invitation to a chocolate tasting event.  [Miller Depo., at 90:15-18.]

---

[5] Referenced portions of Plaintiff's Answers to Defendant's First Set of Interrogatories are attached hereto as Exhibit H.

     c.     She will not take trips longer than three hours on an airplane.  [Miller Depo., at 90:21 to 91:6.]

     d.     She is "seriously considering" whether she will be able to go on a cruise in September.  [Miller Depo., at 92:1-10.]

     e.     She will not "go to things if they're really late at night."  [Miller Depo., at 94:17-21.]

     f.     She "won't go to a late movie."  [Miller Depo., at 94:23 to 95:3.]

     g.     She went to drive-in movies instead of the movie theater.  [Miller Depo., at 99:23 to 100:17.]

     h.     She limited her trips to restaurants.  [Miller Depo., at 100:18-22.]

     i.     She would limit the amount of time she was in a mall or other public places "if I was worried how my temperature would be."  [Miller Depo., at 103:15 to 104:19.]

34.     Between 1999 and 2003, Ms. Miller took two week-long trips to Jamaica (one in 1999 and one in 2001), as well as a trip to Maryland for a Verizon awards program.  [Miller Depo., at 107:18 to 108:22.]

35.     Before she was diagnosed with diabetes, Ms. Miller had taken only three flights longer than four hours in her entire life.  [Miller Depo., at 91:7-20.]

36.     Ms. Miller testified that in the year preceding her diabetes diagnosis, she "was incapacitated much of the time by not feeling well," that "the first couple of hours in the day were my hardest time," and that during those first few hours, "I would suffer a lot with just different gastrointestinal kinds of problems."  [Miller Depo., at 95:7-23.]

BOS_536367_2.DOC/BLAMKIN

37.    Between 1999 and 2003, there were no activities that Ms. Miller was completely prevented from doing.  [Miller Depo., at 99:9-22; 101:14 to 102:7.]

38.    Between 1999 and 2003, Ms. Miller would go grocery shopping, socialize with her friends, occasionally go to restaurants, and do general housework.  [Miller Depo., at 105:8 to 106:5.]

39.    Between 1999 and 2003, Ms. Miller was able to care for herself, except for three occasions when she asked her mother to come help her.  [Miller Depo., at 106:6-13.]

40.    By August or September 2001, Ms. Miller felt that she usually was fully functional by 11:00 in the morning.  [Miller Depo., at 139:8-19.]

41.    Ms. Miller testified that toward the end of her employment at Verizon, "I was functioning very well.  I was feeling much better."  At the time Ms. Miller was terminated from Verizon, she was not substantially limited in any of her daily activities.  [Miller Depo., at 109:12 to 110:6.]

42.    In order to treat her diabetes, Ms. Miller takes medications known as Glucophage and Lisinopril in pill form.  Her treatment also includes "limited sugar intake, limited on carbohydrates, drinking lots of water, getting lots of rest, trying to keep my stress level pretty stable," as well as exercising, making sure she does not have cuts on her extremities, and testing her blood sugar.  [Miller Depo., at 76:6 to 77:6.]

43.    Ms. Miller currently tests her blood sugar about five times per week.  When she was first diagnosed with diabetes, she was testing her blood sugar approximately three times per day.  [Miller Depo., at 84:7-22.]

44.    Ms. Miller's blood sugar tests originally were painful, but "[y]ou kind of get used to it."  [Miller Depo., at 84:23 to 85:3.]

45.    When Ms. Miller first started testing her blood sugar, it took her a couple of minutes to do each test.  Now each test takes about 20 seconds.  [Miller Depo., at 85:4-20.]

46.    Ms. Miller's treatment regimen has remained the same since her diabetes diagnosis.  [Miller Depo., at 75:23 to 76:5.]

47.    Ms. Miller has never been hospitalized for her diabetes, although she went to the hospital twice before her diagnosis for "gastrointestinal distress," and twice afterwards for "gastrointestinal distress" and for a "Niacin reaction."  [Miller Depo., at 85:21 to 86:17; 87:18 to 89:5.]

**D.    PLAINTIFF'S POOR ATTENDANCE AND DISCIPLINARY HISTORY**

48.    In 1999, Ms. Miller was absent from work on approximately 25 days.  [Miller Depo., at 36:20-24]

49.    In 2000, Ms. Miller was absent from work on approximately 45 days.  [Miller Depo., at 37:1-5.]

50.    In 2001, Ms. Miller was absent from work on approximately 65 days.  [Miller Depo., at 37:6-10.]

51.    In 2002, Ms. Miller was absent from work on approximately 34 days.  [Miller Depo., at 37:11-15.]

52.    Attached hereto as Exhibit I is a summary of Ms. Miller's attendance from the time of her hire in 1998 to her termination in February 2003.  The information is taken from Verizon's "Employee Absence/Tardiness Records," commonly referred to as Form 1477s, which Verizon maintains for all employees in accordance with the Attendance Guidelines.  Exhibit I accurately summarizes Ms. Miller's Form 1477s for 1998 through 2003.  [Exhibit I; Raposa Aff., ¶ 6.]

53.     The column in Exhibit I headed "reason per 1477 (attendance record)" relates the reasons that Ms. Miller gave to her managers for arriving at work late, leaving her shift early, or failing to report to work.  Employees are not required to inform their managers of the medical reason for an absence, but Ms. Miller commonly did volunteer information concerning her illnesses to her managers when she reported her absences to them.  Pursuant to company practice, Ms. Miller's managers recorded the reasons that she gave on her attendance record. [Exhibit I; Raposa Aff., ¶ 7.][6]

54.     Attached hereto as Exhibit J is another summary of Ms. Miller's attendance as well as disciplinary action.  [Exhibit J; McGovern Depo., at 166:3-22.]

55.     Beginning in the Summer of 1999, after she had been employed at Verizon for one year and thus was eligible for FMLA leave, Ms. Miller sought and was granted numerous FMLA-qualified absences.  [Exhibits I, J.]

56.     Most of Ms. Miller's absences were for reasons having no apparent connection to diabetes, including a pulmonary embolism or torn muscle, sore ribs, a problem with her glands, the flu, upset stomachs, migraines, a contagious parasite contracted on vacation, a back injury from falling down stairs, strep throat, sinus problems, and an ovarian cyst.  [Exhibits I, J; McGovern Depo., at 204:3-20; Miller Depo., at 66:15 to 69:1.]

57.     Ms. Miller did not inform Verizon that these conditions were related to her diabetes.  [McGovern Depo., at 204:3 to 208:6.]

58.     Verizon engaged in a lengthy progressive discipline process for Ms. Miller's non-FMLA absences.  As part of that process, Verizon warned and suspended Ms. Miller numerous

---

[6] Verizon does not concede that Ms. Miller's managers (as opposed to Verizon's absence control center, which processes FMLA claims) were aware of her diabetes.  The vast majority of the entries on Exhibit I describe symptoms with no reference to diabetes.

BOS_536367_2.DOC/BLAMKIN

times.  Documentation concerning Ms. Miller's disciplinary actions is attached hereto as Exhibit K.  [Exhibits I, J, K.]

59.     Ms. Miller was not disciplined for her FMLA-qualified absences.  [Exhibits I, J, K; Raposa Aff., ¶ 8.]

60.     Ms. Miller's managers disciplined her for her absences much less rigorously than the Attendance Guidelines and company practice allowed.  [Raposa Aff., ¶ 9; Raposa Depo., at 232:5 to 233:14; Exhibits I, J.]

61.     For example, Ms. Miller's managers reduced a "written warning" to a lesser "verbal warning" in February 2001.  [Raposa Aff., ¶ 9; Exhibits I, J, K (at "Miller 0044").]

62.     Ms. Miller was suspended for one day in July 2001.  Her managers took no disciplinary action for an absence occurring on July 9, 2001, after Ms. Miller was denied FMLA leave because she had not worked sufficient hours to qualify, even though, under progressive discipline, she could have been suspended for five days because of her previous one-day suspension.  [Raposa Aff., ¶ 9; Exhibits I, J; 2001 Form 1477 (a copy of which is attached hereto as Exhibit L), entries for 7/11/2001, 7/12/2001, 7/30/2001.]

63.     Similarly, Ms. Miller's managers took no disciplinary action for an absence beginning on August 16, 2001, when, given her other recent, non-approved absences, they could have suspended her for a month.  In discussing this issue on September 4, 2001, Ms. Miller stated that she would be at work every day as scheduled, and acknowledged the likelihood that future absences would result in additional disciplinary steps.  [Raposa Aff., ¶ 9; Exhibits I, J; Exhibit L, entry for 9/4/2001.]

BOS_536367_2.DOC/BLAMKIN

64.     In August 2001, Verizon suspended Ms. Miller for five days.  The union initially grieved this suspension, but withdrew the grievance at the third step.  [Exhibits I, J; Miller Depo., at 63:18 to 64:13.]

65.     In September 2001, Verizon initially suspended Ms. Miller for 30 days because of her continuing, non-FMLA-approved absences.  Verizon amended the discipline to a 20-day suspension after a union grievance.  [Exhibits I, J.]

66.     Ms. Miller was suspended two more times after September 2001, for absences occurring in April and June 2002, before being placed on a final warning in August 2002. [Raposa Aff., ¶ 9; Exhibits I, J, K (at "Miller 0039" and "Miller 0040").]

67.     The suspensions after September 2001 related to Ms. Miller's fall down the stairs and her ovarian cysts, neither of which related to her diabetes.  [Miller Depo., at 66:15 to 67:21; Exhibits I, J.]

68.     Under Verizon's progressive discipline and the Attendance Guidelines, Verizon could have put placed Ms. Miller on Final Warning for the September 2001 absence and then could have terminated her for the April or June 2002 absences.  [Raposa Aff., ¶¶ 4, 9; Attendance Guidelines, at 17 ("[A] continuance of the absence pattern which preceded the Final Warning will result in a termination of employment.").]

69.     After her final warning in August 2002, Ms. Miller was absent or left early 11 more times.  Verizon granted Ms. Miller FMLA leave on four of those occasions, after which she was no longer eligible for FMLA because she had not worked the required 1,250 hours in the preceding year.  [Exhibits I, J; FMLA denial notice (a copy of which is attached hereto as Exhibit M).]

BOS_536367_2.DOC/BLAMKIN

70.    In addition to her illness-related absences, Ms. Miller used all of her available vacation time every year.  [Form 1477s for 2001 (Exhibit L), 2002 (a copy of which is attached hereto as Exhibit N), and 2003 (a copy of which is attached hereto as Exhibit O).]

E.    **PLAINTIFF'S TERMINATION**

71.    On January 22, 2003, Ms. Miller left work early.  She failed to return the following day, claiming she had a stomach problem.  When Ms. Miller attempted to apply for FMLA leave for these absences, her claim was denied because she had failed to work enough hours in the previous 12 months to qualify for FMLA.  [Exhibits I, J, M.]

72.    Effective February 11, 2003, Verizon terminated Ms. Miller for "continued unsatisfactory attendance and failure to comply with the Verizon attendance policy."  A copy of Ms. Miller's termination letter is attached hereto as Exhibit P.

F.    **PLAINTIFF'S UNION GRIEVANCES**

73.    Ms. Miller pursued grievances through the union for a number of her disciplinary actions.  Verizon keeps a record of grievance proceedings through the use of Grievance Fact Sheets that are kept in the normal course of business.  Managers enter the chronology of events into a tracking system and input notes taken at the grievance meetings.  [McGovern Depo., at 181:3 to 182:13; 221:24 to 222:9.]

74.    The union initially grieved Ms. Miller's five-day suspension in August 2001.  A copy of the Grievance Fact Sheet relating to this grievance is attached hereto as Exhibit R.  At the first step meeting, the union representative, Kristina Santos, "[t]hanked management for leeway concerning discipline steps and concern for [Ms. Miller's] illness."  The union withdrew the grievance at the third step.  [Exhibits I, J; Exhibit R, at VER0289, VER0291; Miller Depo., at 63:18 to 64:13.]

75.    The union also grieved Ms. Miller's 30-day suspension in September 2001.  A copy of the Grievance Fact Sheet relating to this grievance is attached hereto as Exhibit S.  At the first step meeting on December 6, 2001, Ms. Miller's manager, Hans Peterson, stated that "[w]e have been very lenient in discipline not taken," to which the union representative, Kristina Santos, replied, "We appreciate that you have bent over backwards to help her."  [Exhibit S, at VER0284-0285.]

76.    At the second step of the union's grievance of the 30-day suspension, the union accepted a reduction of the suspension to 20 days, on the condition that Ms. Miller consult with the Employee Assistance Program in an effort to improve her attendance.  [Exhibit S, at VER0286.]

77.    Ms. Miller also grieved her termination.  Verizon denied that grievance.  [Wood Depo., at 13:23 to 14:14.]

G.    **PLAINTIFF'S REFERRALS TO THE EMPLOYEE ASSISTANCE PROGRAM**

78.    Verizon has an Employee Assistance Program ("EAP"), which provides confidential assessment, counseling, referral and follow-up services to employees who have personal issues, including medical conditions which impact their job performance.  [Affidavit of Peter Magner ("Magner Aff."), ¶ 2.][7]

79.    The EAP commonly provides assessment and referral services for employees whose medical condition may impact their ability to provide regular attendance.  These services commonly include referral to medical resources to work with the employee and the employee's health care providers to help determine whether the employee is taking appropriate steps to manage her condition and to assist in evaluating possible accommodations.  [Magner Aff., ¶ 3.]

---

[7] The Magner Affidavit, a copy of which is attached hereto as Exhibit Q, was previously submitted to the MCAD in connection with Ms. Miller's Charge of Discrimination.

80.     On numerous occasions, Verizon recommended that Ms. Miller seek the assistance of the EAP in managing her attendance issues.  [Raposa Aff., ¶ 12.]

81.     Verizon recommended the EAP to Ms. Miller on, at a minimum, December 26, 2000; January 2, 2001; March 29, 2001; July 5, 2001; July 12, 2001; September 21, 2001; and October 5, 2001.  [Exhibit R, at VER0288-0289.]

82.     At the second-step grievance meeting on January 31, 2002, Verizon "job assigned" Ms. Miller to the EAP in exchange for reducing her 30-day suspension.  [Raposa Aff., ¶ 12; Exhibit S, at VER0285-0286; McGovern Depo., at 53:23 to 54:19; Miller Depo., at 54:2-7.]

83.     Ms. Miller refused to contact the EAP, even when Verizon "job assigned" her to do so.  [Miller Depo., at 54:2 to 55:3; Magner Aff., ¶ 4.]

## H.    PLAINTIFF'S ALLEGED REQUESTS FOR ACCOMMODATIONS

84.     Ms. Miller claims that she asked for two different accommodations for her diabetes:  coming to work late, and using vacation and personal time in lieu of sick time.  [Miller Depo., at 147:22 to 148:10; Plaintiff's Answer to Defendant's First Set of Interrogatories, Int. Nos. 10, 14.]

85.     Sometime in August or September of 2001, Ms. Miller claims that she asked one of her managers, Sally Sullivan, if she could come to work two hours late on those mornings that she was feeling ill.  [Miller Depo., at 137:6 to 139:19.]

86.     Ms. Miller never provided details about how long a period of time she believed she would need to come in late to work.  [Miller Depo., at 151:13-21.]

87.     At the time Ms. Miller allegedly sought this accommodation, her normal work hours were from 9:00 a.m. to 6:00 p.m.  [Miller Depo., at 140:11-22.]

88.     The Verizon office in which Ms. Miller worked closed at 6:00 p.m.  There were no shifts beyond 6:00 p.m.  Therefore, Ms. Miller could not have worked from 11:00 a.m. to 8:00 p.m.  [Miller Depo., at 143:20 to 144:11.]

89.     Although Ms. Miller allegedly proposed coming in to work at 11:00 a.m. instead of 9:00 a.m., she never discussed whether or how she would make up the extra two hours.  [Miller Depo., at 140:23 to 141:10.]

90.     Employees' use of vacation time is subject to the terms of the Collective Bargaining Agreement ("CBA") between Verizon and the union.  [McGovern Depo., at 88:19 to 89:13.]

91.     Copies of relevant portions of the CBA are attached hereto as Exhibit T.

92.     Section 21.10(a) of the CBA provides that vacation time is not to be used for absences due to illness.  Specifically, it states:

> When an employee's absence due to sickness or accident disability begins prior to the employee's scheduled vacation, and the employee does not return before December 31, the remaining vacation will be deferred until termination of such absence.  If the employee returns prior to December 31 and is unable to complete the vacation in the current vacation year, the remaining vacation will be deferred.

[Exhibit T, at 39; McGovern Depo., at 89:14-18; 219:11-23; 220:16 to 221:6.]

93.     Section 21.18 of the CBA states that vacations are scheduled based on seniority.  Section 21.11 provides that employee who are eligible for two weeks of vacation may use one of those weeks on a "day-at-a-time basis" according to the rules set out in that section.  The use of single vacation days may be permitted "on the basis of the earliest request in accordance with the requirements of the service."  [Exhibit T, at 40, 42.]

94.     On one occasion in January 2003, Ms. Miller asked that she be allowed, retroactively, to substitute vacation or personal days for an illness-related absence that already

BOS_536367_2.DOC/BLAMKIN

had occurred in order to avoid a suspension.  Verizon rejected this request.  [Miller Depo., at 120:5-15; 144:12 to 146:11.]

95.    Verizon employees are not permitted to change time records retroactively, including attempts to recharacterize illness-related absences as vacation.  Miscoding time in this fashion could violate the CBA.  It also violates Verizon's Code of Business Conduct, which requires employees to "prepare company records completely, accurately, and truthfully," to "not knowingly prepare, maintain or provide false or misleading records or data."[8]  Such miscoding has potential ramifications under OSHA, as well as under ERISA, since Verizon has a disability benefits plan that provides benefits starting on the eighth day of a qualifying absence. [McGovern Depo., at 218:4 to 219:10; Raposa Aff., ¶ 14; Exhibit U, at VER0146.]

96.    Ms. Miller did not speak with any of her doctors about possible accommodations in the workplace.  [Miller Depo., at 154:24 to 155:8.]

## I.    LACK OF EVIDENCE OF DISCRIMINATORY ANIMUS

97.    Ms. Miller has alleged that "[t]he management of the Defendant made statements that led the Plaintiff to believe that her requests for leave for her handicap and disability upset them."  However, Ms. Miller has identified only one individual – Hans Peterson – who allegedly made these statements, and the only alleged statements she has identified are "comments to the effect of me being 'an ongoing attendance problem for years' and that I 'could have used vacation time when I went home but chose sick time instead.'"  [Complaint, ¶ 13; Plaintiff's Answer to Defendant's First Set of Interrogatories, Int. No. 12.]

98.    Ms. Miller never heard the alleged statements by Mr. Peterson.  Rather, she claims that Mr. Peterson made these statements to a union representative, who then repeated them to Ms. Miller.  [Miller Depo., at 155:15 to 156:10.]

---

[8] Referenced portions of the Code of Business Conduct are attached hereto as Exhibit U.

99.    No one at Verizon said anything to Ms. Miller suggesting they thought she was handicapped or disabled.  [Miller Depo., at 135:9-20.]

100.    Ms. Miller asserts that after she had begun calling in sick more frequently, she "felt more like if I did call out, maybe it wasn't – maybe they weren't believing that I was out sick.  It was a feeling like that rather than someone stating to me, You're out too much."  She based this feeling on alleged statements by one of her managers, Sally Sullivan, "like, Are you sure you're sick; are you sure you can't come in, things like that that just gave me the impression that they were doubting me, when I was more than willing if I was well, to come in and do everything that was expected of me."  [Miller Depo., at 51:18 to 52:17.]

**J.    LACK OF EVIDENCE OF RETALIATION**

101.    Ms. Miller's basis for her claim of retaliation is that "my work was more closely scrutinized and unduly criticized by management in the approximately three months preceding my termination of employment."  [Plaintiff's Answer to Defendant's First Set of Interrogatories, Int. No. 13.]

102.    Ms. Miller felt that her calls were being observed more frequently after she refused to go to the EAP.  [Miller Depo., at 156:12 to 158:16.]

103.    The only fact of which Ms. Miller is aware to support her retaliation claim is the alleged "absolute increase in the observations of my telephone calls."  [Miller Depo., at 159:8 to 160:3; 162:11-16.]

104.    Even during the time she claims that Verizon was observing her more closely, she was not frequently called into meetings to discuss the observations.  She believes this happened about four or five times between March 2002 and the time she was terminated in February 2003. [Miller Depo., at 161:8-23.]

- 18 -

105.    Ms. Miller was never disciplined as a result of this alleged heightened scrutiny. [Miller Depo., at 161:24 to 162:2.]

## K.    MS. MILLER'S EMPLOYABILITY

106.    Ms. Miller has been employed at the Magic Wings Butterfly Conservatory since April 2003, and has been a full-time employee there since September 2003.  [Miller Depo., at 9:7 to 12:7.]

107.    In March 2004, Ms. Miller became the general manager of the Magic Wings Butterfly Conservatory, a position she continues to hold.  In that capacity, Ms. Miller manages a staff of 35-40 people, and is responsible for human resources, advertising, marketing, event planning, and other duties.  Ms. Miller normally works nine-hour days, and often as many as 12 hours per day.  [Miller Depo., at 13:13 to 15:2.]

108.    Ms. Miller has a bachelor's degree in psychology and a master's degree in counseling psychology.  For approximately 10 years before working for Verizon, she worked in a variety of jobs in the mental health field.  [Miller Depo., at 24:13 to 28:8.]

VERIZON COMMUNICATIONS, INC.,
By its attorneys,

/s/ Timothy P. Van Dyck
Timothy P. Van Dyck (BBO #548347)
Windy L. Rosebush (BBO #636962)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100
(617) 227-4420 (fax)

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 25, 2006, and that there are no non-registered participants.

                        /s/ Timothy P. Van Dyck
                        Timothy P. Van Dyck (BBO #548347)

BOS_536367_2.DOC/BLAMKIN

# **LIST OF EXHIBITS**

| | |
|---|---|
| A | Miller Deposition Excerpts |
| B | Raposa Affidavit |
| C | Raposa Deposition Excerpts |
| D | Wood Deposition Excerpts |
| E | McGovern Deposition Excerpts |
| F | Job Brief |
| G | Excerpts From Attendance Guidelines |
| H | Plaintiff's Answers to Defendant's First Set of Interrogatories |
| I | Summary of Plaintiff's Attendance Records |
| J | Summary of Plaintiff's Attendance Records and Disciplinary History |
| K | Documentation Concerning Plaintiff's Disciplinary History |
| L | Plaintiff's 2001 Form 1477 |
| M | FMLA Denial Notice |
| N | Plaintiff's 2002 Form 1477 |
| O | Plaintiff's 2003 Form 1477 |
| P | Plaintiff's Termination Letter |
| Q | Magner Affidavit |
| R | August 2001 Grievance Fact Sheet |
| S | September 2001 Grievance Fact Sheet |
| T | Excerpts From Collective Bargaining Agreement |
| U | Excerpts From Code of Business Conduct |