UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30117-KPN

KATHLEEN MILLER,
                    Plaintiff

v.

VERIZON COMMUNICATIONS INC.,
                    Defendant

**PLAINTIFF'S MOTION TO AMEND LOCAL RULE 56.1 STATEMENT**

NOW COMES the Plaintiff, Kathleen Miller, in the instant case, pursuant to F.R.C.P. Rule 15 and otherwise, and moves to amend her Local Rule 56.1 Response by further categorizing and condensing the Plaintiff's factual responses set forth in Paragraphs 109 to 287 and by referring to specific paragraph numbers in the Plaintiff's Affidavit.  As reasons therefor, the Plaintiff states as follows:

1.  The instant case is an extremely fact-intensive case.  The Defendant cited to 108 paragraphs in its Rule 56.1 Statement (Defendant's Facts).  The Plaintiff responded concisely to the Defendant's Facts by citing to relevant, material and disputed facts in the record in Paragraphs 1 through 108.  The Plaintiff also added Paragraphs 109 to 287 "Additional Facts" which were meant primarily to show the inconsistencies among managers on key factual points (material facts in dispute).

2.  The Defendant has taken issue in its Reply Memorandum, and in its Motion to Strike, with the Plaintiff's Rule 56.1 submission.  Essentially, the Defendant contends that the Plaintiff's Additional Facts are not categorized and that the Plaintiff's facts do not refer to

paragraph numbers in the Plaintiff's Affidavit.[1]  Although the Plaintiff disputes this

contention of the Defendant in her opposition to the Defendant's Motion to Strike, the

Plaintiff has attached hereto as Exhibit A her proposed amendment to her Rule 56.1

Response.

3.  The Plaintiff's proposed amendment (Exhibit A) does not change the content of the

Plaintiff's initial Rule 56.1 filing, nor does it add any additional facts or evidence.  The

Plaintiff has merely categorized and further condensed the Plaintiff's Additional Facts

and refers to specific paragraphs where reference is made to the Plaintiff's Affidavit.

Therefore, this amendment to the Plaintiff's Rule 56.1 Response only serves to assist the

Court in understanding the Plaintiff's position on summary judgment, and amendments to

pleadings are freely allowed.  See F.R.C.P. Rule 15 and <u>Lewis v. City of Boston</u>, C.A.

No.: 00-11548-DPW (D.Mass. 2002).

WHEREFORE, the Plaintiff respectfully requests that this Court allow the Plaintiff's to

file for the Court's consideration the Amended Response (Exhibit A hereto).

Respectfully submitted:

The Plaintiff
KATHLEEN MILLER

By:  /s/ Michael O. Shea
     Michael O. Shea, Esq.
     BBO No. 555474
     Law Office Of Michael O. Shea, P.C.
     451 Main Street
     Wilbraham, MA 01095
     Telephone No.: (413)596-8005
     Facsimile No.: (413)596-8095

Dated:  August 2, 2006

---

[1] Separately, the Defendant asserts that the Plaintiff's citations to the record are not accurate in some places, and the Plaintiff has addressed those assertions in her opposition Memorandum to the Motion to Strike.

<u>Local Rule 7.1 Certification</u>

I hereby certify that I have conferred with Defendant's Counsel on this date and that Defendant's Counsel has indicated that they will not assent to the allowance of the within Motion.

<u>/s/ Michael O. Shea</u>

<u>Certificate Of Service</u>

I hereby certify that a true copy of the foregoing Motion was served upon Counsel for the Defendant, Timothy P. Van Dyke, Edwards, Angell, Palmer & Dodge, LLP, 111 Huntington Avenue, Boston, MA 02199, by electronic filing on this 2nd day of August, 2006.

<u>/s/ Michael O. Shea</u>
Michael O. Shea

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30117-KPN

KATHLEEN MILLER,
                          Plaintiff

v.

VERIZON COMMUNICATIONS, INC.,
                          Defendant

**PLAINTIFF'S AMENDED RESPONSE TO "DEFENDANT'S STATEMENT OF
UNDISPUTED FACTS"**

The Plaintiff, Kathleen Miller ("the Plaintiff") has opposed the Defendant's Motion for

Summary Judgment.  In support of such opposition, the Plaintiff submits that there are genuine

issues to be tried, and that the following material facts are in dispute. [1]

**A.    THE SERVICE REPRESENTATIVE POSITION**

1.      The Plaintiff does not dispute the contents of Paragraph 1 of *Defendant's Statement of
        Undisputed Facts* ("*Defendant's Facts*")

2.      The Plaintiff does not dispute the contents of Paragraph 2 of *Defendant's Facts.*

3.      The Plaintiff does not dispute the contents of Paragraph 3 of *Defendant's Facts*.

4.      The Plaintiff does not dispute the contents of Paragraph 4 of *Defendant's Facts.*

5.      The Plaintiff does not dispute the contents of Paragraph 5 of *Defendant's Facts.*

6.      The Plaintiff does not dispute the contents of Paragraph 6 of *Defendant's Facts,* except as

follows: Paul McGovern, Defendant's EEO Manager, did allow certain employees to work from

home on the past.  Handicapped employees were allowed to work from home. (McGovern Dep.

pp. 47-49; Exh. 2)  Doreen Smith, was allowed to work from home.  Ms. Smith's managers were

---

[1] The numbered paragraphs herein correspond to the numbered paragraphs found in Defendant's Statement of
Undisputed Facts.  The Exhibits referred to herein refer to the numbered Exhibits attached hereto.

involved in providing this accommodation.  She had complications with Polio. (McGovern Dep. pp. 47-49; Exh. 2)  McGovern could not gainsay that it was possible for a non-management employee like the Plaintiff to work from home.  In fact, McGovern indicated that under the circumstances that could be possible. (McGovern Dep. pp. 50-52; Exh. 2)  McGovern clearly stated that non-management employees were allowed to modify their work schedules.  Service Representatives have been allowed this accommodation.  In fact, McGovern indicated that that Defendant goes through this process on a regular basis. (McGovern Dep. pp. 51-54; Exh. 2)  McGovern clearly stated that there were circumstances where non-management employees were given modified schedules for "medical needs," making work more difficult. (McGovern Dep. p. 52; Exh. 2)  The Plaintiff also states that she had the capability of working a modified work schedule or working from home without causing the Defendant an economic hardship. (Plaintiff's Affidavit; Exh. 9, Par. 19)

7.      The Plaintiff does not dispute the contents of Paragraph 7 of *Defendant's Facts.*

8.      The Defendant's reliance on Ms. Raposa's commentary relative to government regulations and requirements of the Service Representative position and attendance affects on the regulatory system are unreliable, in light of the fact that she testified under oath that "[she] do[es] not know of any of the regulatory and legal matters of [the] company." (Raposa Dep. p. 76: Exh. 3)

9.      The Plaintiff says that the requirements for a Service Representative are not "strict" as the Defendant alleges.  (Plaintiff's Affidavit; Exh. 9, Par. 19)

10.     The Plaintiff says that attendance is not an essential element of the Service Representative position.  McGovern, again the Defendant's EEO manager, noted "…under the absence control plan there is no hard and fast rule.  There are department practices." (McGovern Dep. p. 148; Exh. 2)  As to a Service Representative working from home, McGovern testified

that "there could be review and that could be part of an interactive process of accommodation which would be specific to the individual and to the situation." (McGovern Dep. pp. 50-51; Exh. 2) McGovern outlined circumstances under which non-management employees could modify their work schedule including "medical needs making early morning work difficult." (McGovern Dep. p. 52) McGovern did allow certain employees to work from home on the past. Handicapped employees were allowed to work from home. (McGovern Dep. pp. 47-49; Exh. 2) As noted above, Doreen Smith, was allowed to work from home. Ms. Smith's managers were involved in providing this accommodation. She had complications with Polio. (McGovern Dep. pp. 47-49; Exh. 2) McGovern could not gainsay that it was possible for a non-management employee like the Plaintiff to work from home. In fact, McGovern indicated that under the circumstances that could be possible. (McGovern Dep. pp. 50-52; Exh. 2) In addition, McGovern clearly stated that non-management employees were allowed to modify their work schedules. Service Representatives have been allowed this accommodation. In fact, McGovern indicated that that Defendant goes through this process on a regular basis. (McGovern Dep. pp. 51-54; Exh. 2) The Plaintiff also states that she had the capability of working a modified work schedule or working from home without causing the Defendant an economic hardship. (Plaintiff's Affidavit; Exh. 9, Par. 19) See also, the facts set forth in Paragraphs 112-124, which are incorporated herein by reference.

11.     The Plaintiff states that the Defendant does have the capability of calling a replacement Service Representative if one does not show for work. (Plaintiff's Affidavit; Exh. 9, Par.19)

12.     If a Service Representative does not appear for work, other Service Representatives may have to take on more calls; however this has never been an issue in the past, and it has not cost the Defendant any economic losses or hardship. While the Plaintiff was employed with the Defendant, this has occurred with relative frequency without any issue of loss of business or

3

problems answering calls promptly.  There is no way to control the number of calls in any event, no matter how many calls come in on a given shift, and there has always been adequate coverage without issue.  (Plaintiff's Affidavit; Exh. 9, Par.19)

13.    McGovern could not gainsay that it was possible for a non-management employee like the Plaintiff to work from home.  In fact, McGovern indicated that under the circumstances that could be possible. (McGovern Dep. pp. 50-52; Exh. 2)  McGovern clearly stated that non-management employees were allowed to modify their work schedules.  Service Representatives have been allowed this accommodation.  In fact, McGovern indicated that that Defendant goes through this process on a regular basis. (McGovern Dep. pp. 51-54; Exh. 2)  McGovern clearly stated that there were circumstances where non-management employees were also given modified schedules for "medical needs," making work more difficult. (McGovern Dep. p. 52; Exh. 2)  The Plaintiff also states that she had the capability of working a modified work schedule or working from home without causing the Defendant an economic hardship.  (Plaintiff's Affidavit; Exh. 9, Par. 19)  See also, the facts set forth in Paragraphs 112-124, which are incorporated herein by reference.

14.    The Plaintiff does not dispute the contents of Paragraph 14 of *Defendant's Facts*.

15.    The Service Representative position requires attendance, but that attendance may be modified for medical reasons or for reasons of a handicap.  The "hours to be worked are determined by seniority, job requirements, qualifications and employee preference." (McGovern Dep. pp. 158-159; Exh. 2)   Management makes determinations relative to hours worked. (McGovern Dep. p. 158; Exh. 2)  To McGovern's knowledge, no one looked at the Plaintiff's qualifications, medical condition or preference when determining her hours. (McGovern Dep. pp. 160-161; Exh. 2)  The Plaintiff also reiterates and incorporates herein her position outlined at

Paragraph 10 above. See also, the facts set forth in Paragraphs 112-136, which are incorporated herein by reference.

16.    The Plaintiff does not dispute the contents of Paragraph 16 of *Defendant's Facts* but reiterates and incorporates herein her position outlined at Paragraphs 10 and 15 above.

17.    The Job Brief and its wording states what it states, but the Plaintiff says that the Job Brief is not entirely accurate as to the Plaintiff's job functions.  See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

18.     The Job Brief and its wording states what it states, but the Plaintiff says that the Job Brief is not entirely accurate as to the Plaintiff's job functions. See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

19.    The Plaintiff states that the Service Representatives are not normally monitored "extensively" and the Plaintiff could have worked on a modified schedule or worked from home. (Plaintiff's Affidavit; Exh. 9, Par. 19)   In addition, managers have discretion in deciding when to conduct remote observations, according to Mary Ellen Wood, one of the Defendant's managers at Verizon. (Wood Dep. p. 64; Exh. 4)

## B.    <u>DEFENDANT'S ATTENDANCE POLICY</u>

20.     The Plaintiff reiterates and incorporates herein her position outlined at Paragraphs 10 and 15 above.

21.     The Plaintiff does not dispute the contents of Paragraph 21 of *Defendant's Facts*.

22.     The Plaintiff does not dispute the contents of Paragraph 22 of *Defendant's Facts*.

23.     The Plaintiff does not dispute that the Attendance Guidelines state was is alleged in Paragraph 23 of *Defendant's Facts* but reiterates and incorporates herein her position outlined at Paragraphs 10 and 15 above and further adds that, according to Ms. Raposa, attendance manager, "it is recognized however that all employees are subject to various occurrences in their daily

lives which require them to be off the job from time to time…" (Raposa Dep. pp. 58-59; Exh.3)

The phrase "various occurrences in their daily lives" could mean "being ill" or "something that was not letting them come to work." (Raposa Dep. pp. 59-60; Exh. 3)   In addition, there is no set number of days listed in the attendance policy indicating what constitutes poor attendance. (Wood Dep. pp. 71-72; Exh. 4)  Management determines which blocks of time one is required to be in attendance.  (McGovern Dep. pp. 158-159; Exh. 2)  See also, the facts set forth in Paragraphs 125-136, which are incorporated herein by reference.

24.    The Plaintiff does not dispute the contents of Paragraph 24 of *Defendant's Facts*, but reiterates and incorporates herein her position outlined at Paragraphs 10, 15, and 23 above and further adds that a bona fide illness means one that is legitimate and diabetes is a "medical condition that can certainly be bona fide and the absence which may result from it may be extraordinary."  (McGovern Dep. pp. 144-146; Exh. 2)

25.    The Plaintiff does not dispute the contents of Paragraph 25 of *Defendant's Facts*, but reiterates and incorporates herein her position outlined at Paragraphs 10, 15, 23 and 24 above.

26.    The Plaintiff does not dispute the contents of Paragraph 26 of *Defendant's Facts*, but reiterates and incorporates herein her position outlined at Paragraphs 10, 15, 23 and 24 above.

**C.    <u>PLAINTIFF'S DIABETES</u>**

27.    The Plaintiff does not dispute the contents of Paragraph 25 of *Defendant's Facts*, but adds that she informed the Defendant regarding her diagnosis of diabetes via telephone in or about February of 2000. (Plaintiff's Affidavit; Exh. 9, Par. 4)  The Plaintiff's managers knew she had diabetes through conversations with the Plaintiff.  (McGovern Dep. p. 58; Exh. 2) McGovern also testified that if the union knew about her diabetes then her managers knew as well. (McGovern Dep. p. 207; Exh. 2) The union representatives and the Plaintiff's managers

acknowledge that they knew about her "condition" as they refer to it during each grievance meeting.  (Grievance Documentation; Exh. 7)  The Plaintiff and her medical providers also gave the Defendant medical documentation supporting her diabetes and diabetes-related conditions. (Medical and FMLA Documentation; Exh. 6)  See also, the facts contained in Paragraphs 109-111, 150-153, which are incorporated herein by reference.

28.     The Plaintiff "was substantially limited in the major life activity of work, among other life functions." (Plaintiff's Answer to Defendant's Interrogatory No. 16; Exh. 10)  The Plaintiff experienced "nausea, stomach pain, vomiting, dizziness, difficulty eating, diarrhea…abdominal cramping...more ill with routine colds and  ...greater side effects in adjusting to medication," which were all related to her diabetes. (Plaintiff's Answer to Defendant's Interrogatory No. 8; Exh. 10)  Because of her diabetes-related symptoms and side effects, the Plaintiff, for one year prior to her diagnosis and for three years after, "pretty much felt sick on a daily basis." (Miller Dep. p. 97; Exh. 1)  There were times when the Plaintiff's diabetes prevented her from leaving the house.  (Miller Dep. p. 97; Exh. 1)  During the four year period of time referred to herein, the Plaintiff's diabetic condition interfered and substantially limited her sleeping, eating, and driving. (Miller Dep. pp. 31, 98; Exh. 1; and Plaintiff's Answer to Defendant's Interrogatory No. 8; Exh. 10)  Due to her diabetes, the Plaintiff is substantially limited in her ability to reproduce. (Miller Dep. p. 107; Exh. 1)  See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

29.     The Plaintiff has adjusted to her diet modifications *over time*.  At the present time, she can successfully choose foods that meet those diet restrictions. (Miller Dep. pp. 76-79; Exh. 1) The Plaintiff's diet restrictions consist of limiting sugar intake.  She must stay away from any kind of fruit juice, some fruits, white rice, white bread, potatoes, pasta, enriched flour and products that are not wheat-based.   She had to switch to diet soda or water and to green

vegetables. (Miller Dep. pp. 76-79; Exh. 1) These symptoms were related to her diabetes and conveyed to the Defendant. (Plaintiff's Affidavit; Exh. 9, Par. 21) See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

30.    The Plaintiff currently goes to bed around 9:30 p.m. and awakens around 6:30 a.m. or 7:30 a.m. (Miller Dep. pp. 79-80; Exh. 1) The Plaintiff also had severe problems getting to work as scheduled as a direct result of the symptoms of her diabetes and medication for her diabetes. (Plaintiff's Affidavit; Exh. 9, Par. 5) At the time that she was employed with the Defendant, and within the one year prior to and three years after her diabetes diagnosis, the Plaintiff indicates she was sick daily, and often would "wake up in the middle of the night and be sick." (Miller Dep. pp. 97-98; Exh. 1) The Plaintiff also suffered from a severe lack of sleep while employed with the Defendant in 2002. (Plaintiff's Answer to Defendant's Interrogatory No. 8; Exh. 10) These symptoms were related to her diabetes and conveyed to the Defendant. (Plaintiff's Affidavit; Exh. 9, Par. 5, 6, 8, 9, 12) See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

31.    The Plaintiff does not dispute the contents of Paragraph 31 of *Defendant's Facts*, as same pertains to her exercise regime of 2006. However, during her employment with the Defendant, and more specifically, during the one year prior and three years after her diabetes diagnosis, she did not exercise as she "pretty much felt sick on a daily basis." (Miller Dep. p. 97; Exh. 1) During the time that the Plaintiff was employed with the Defendant, she was so sick that she could not even take a shower or leave the house. (Miller Dep. pp. 97, 99; Exh. 1) These symptoms were related to her diabetes and conveyed to the Defendant. (Plaintiff's Affidavit; Exh.9, Par. 5, 6, 8, 9, 12) See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

32.    The Plaintiff has trouble with motion sickness if she is the passenger in a vehicle and, therefore, prefers to drive.  However, during the critical timeframe of one year prior to and three years after the Plaintiff's diagnosis of diabetes, there were days when she would be too sick to drive.  For the Plaintiff, the mornings were the worst for driving and actually doing anything.  There were occasions where she would have to stop on the way to work or wherever she might be if she felt sick.  (Miller Dep. pp. 31-32; Exh. 1)  These symptoms were related to her diabetes.  (Plaintiff's Affidavit; Exh. 9, Par. 12)  See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

33.    The Plaintiff does not dispute the contents of Paragraph 33 of *Defendant's Facts*, but adds that she has had other limitations as well.  (Plaintiff's Affidavit; Exh. 9, Par. 5, 9, 12)  See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

34.    The Plaintiff does not dispute the contents of Paragraph 34 of *Defendant's Facts*, but reiterates and incorporates herein her position outlined at Paragraph 33.

35.    The Plaintiff does not dispute the contents of Paragraph 35 of *Defendant's Facts*, but reiterates and incorporates herein her position outlined at Paragraph 33.

36.    The Plaintiff does not dispute the contents of Paragraph 36 of *Defendant's Facts*.

37.    The Plaintiff reiterates and incorporates herein her position outlined at Paragraphs 28 to 33, inclusive.

38.    The Plaintiff does not dispute the contents of Paragraph 38 of *Defendant's Facts*, but adds that she could do all of those things "as long as [she] felt good enough to do them.  [Her] friends would come see [her] if [she] couldn't go see them.  They would come to [her] house and see [her].  If [she] couldn't grocery shop, [her] mother would take care of [her]..."  (Miller Dep. pp. 105-106; Exh. 1)  See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

39.     The Plaintiff does not dispute the contents of Paragraph 39 of *Defendant's Facts* but reiterates and incorporates herein her position at Paragraphs 38 and 28 to 33, inclusive.

40.     The Plaintiff does not dispute the contents of Paragraph 40 of *Defendant's Facts* but adds that there were days that she was home and that by "eleven o'clock or so [her sickness or symptoms or side effects] resolved itself, and [she] felt very much like [she] would be able to go to work and perform [her] activities" but that "there was [sic] still days where [she] was down for the whole day, but it was not every single day like it had been. There were days that [she] remember[s] being at home after needing to call out sick thinking, there is absolutely no reason that [she] should not be at work right now, again, leading [her] to feel punished."  (Miller Dep. p. 139; Exh. 1) See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

41.      The Plaintiff reiterates and incorporates herein her position at Paragraphs 40 and 28 to 33, inclusive. The Plaintiff also states that she was substantially limited in her daily life activities at the time of her termination of employment and since then.  (Plaintiff's Affididavit; Exh. 9) See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

42.     The Plaintiff does not dispute the contents of Paragraph 42 of *Defendant's Facts.*

43.     The Plaintiff does not dispute the contents of Paragraph 43 of *Defendant's Facts.*

44.      The Plaintiff does not dispute the contents of Paragraph 44 of *Defendant's Facts* but ads that she has a Glucometer that "come[s] with a device that will prick your finger for you…It accepts blood and then within five seconds you get a number."  (Miller Dep. p. 84; Exh. 1) The Plaintiff got used to the pain of taking pricking her fingers and had calluses in the beginning. (Miller Dep. pp. 84-85; Exh. 1) See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

45.     The Plaintiff does not dispute the contents of Paragraph 45 of *Defendant's Facts*,

but reiterates and incorporates herein her position at Paragraph 44.

46.     The names of the medications that the Plaintiff has taken may not have changed since her diabetes diagnosis but the dosage has been adjusted over time.  (Miller Dep. pp. 95-96; Exh. 1) See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

47.     The Plaintiff has been treated at the hospital for her diabetic condition. (Miller Dep. pp. 85-86; Exh. 1)  See also, the facts contained in Paragraphs 109-111, which are incorporated herein by reference.

## D.     PLAINTIFF'S ALLEGED POOR ATTENDANCE AND DISCIPLINARY HISTORY

48.     The Plaintiff does not dispute the contents of Paragraph 48 of *Defendant's Facts* but reiterates and incorporates herein her position at Paragraphs 28 and 33 and adds the following: Verizon does not offer sick time, according to some managers but not other managers. (Raposa Dep. pp. 60-61; Exh. 3)  Sick days are actually unapproved absences unless approved under the Family Medical Leave Act ("FMLA") (Raposa Dep. p. 117; Exh. 3)  Protected leave is that which is FMLA approved and is, therefore, not subject to discipline.  (McGovern Dep. pp. 118-119; Exh. 2)  See also, Plaintiff's position at Paragraph 54 wherein it indicates that she was indeed disciplined during FMLA approved time off.   Every time an employee wants to call out sick, one must call the 800 number since "you need to get FMLA approved or disapproved.  The occasion that is acceptable for that time frame is five days."  But instead, the Plaintiff "would be out the exact amount of days that [she] needed to be out sick.  Unfortunately, that did not always work in [her] favor because a few days later, [she] would be sick again, needing to call the 800 number" which would commence a new "rotation of absence." (Miller Dep. pp. 60-61; Exh. 1) The Plaintiff always explained her diabetes-related conditions when she called in sick to her managers.  (Plaintiff's Affidavit; Exh. 9; Par. 8, 12)  Should an individual exhaust FMLA time

and require additional time off for a diabetes-related condition, that request would be reasonable. (McGovern Dep. p. 121; Exh. 2) The Plaintiff also incorporates herein her position at Paragraphs 84, 86 and 90. See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

49.    The Plaintiff reiterates and incorporates herein her position at Paragraph 48.

50.    The Plaintiff reiterates and incorporates herein her position at Paragraph 48.

51.    The Plaintiff reiterates and incorporates herein her position at Paragraph 48.

52.    The Plaintiff disputes the Defendant's attendance summary referenced in Paragraph 52 and attaches her records referencing her time off. (Attendance Records; Exh. 9A) See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

53.    The Plaintiff does not dispute the contents of Paragraph 53 of *Defendant's Facts* that indicate the Defendant did record the reasons for the Plaintiff's absences, but she does dispute the allegation that the Defendant accurately recorded her absences and the reasons for her absences. The Plaintiff also disputes the allegations made in Footnote 6 indicating that Verizon did not know the Plaintiff had diabetes. The Defendant admits to knowing about Plaintiff's diabetic condition and, therefore, the Plaintiff reiterates and incorporates herein her position at Paragraph 27. See also, the facts set forth in Paragraphs 125-141, 150-153, which are incorporated herein by reference.

54.    The Plaintiff does not dispute the contents of Paragraph 54 of *Defendant's Facts* except insofar as she did explain the diabetes-related conditions to her mangers when she called in sick. (Plaintiff's Affidavit; Exh. 9, Par. 8, 12) In addition, the document contained in *Defendant's Exhibit J* indicates that the Plaintiff was given a written warning during FMLA-approved time on May 26, 2000 and was suspended during FMLA-approved time from September 16, 2000 to

September 15, 2000.  (Miller Dep. pp. 58:3-59; Exh. 1)  See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

55.     The Plaintiff does not dispute the contents of Paragraph 55 of *Defendant's Facts* but reiterates and incorporates herein her position at Paragraphs 48 and 54.

56.     The Plaintiff disputes the allegations of Paragraph 56 of the Defendant's Facts and says the most of her absences were diabetes-related and she conveyed that to management when she was going to be out sick.  (Plaintiff's Affidavit; Exh. 9, Par. 8, 12, 17;  FMLA Documentation and Medical Notes; Exh. 6, and Grievance Documents; Exh. 7)  According to Mr. McGovern, the Plaintiff's managers were not able to make decisions regarding medical conditions and accommodation needs "they do not make those judgments" and they do not do a medical review as they have no medical background for that.  (McGovern Dep. pp. 223-224; Exh. 2)  Yet, these same individuals who clearly have no medical background or ability to determine if there was a connection between the Plaintiff's reasons for illness and diabetic condition did just that when they reprimanded and ultimately terminated her employment for diabetes-related absences.  See also, the facts contained in Paragraph 112-136, which are incorporated herein by reference.

57.     The Plaintiff disputes the allegations of Paragraph 56 of the Defendant's Facts and says the most of her absences were diabetes-related and she conveyed that to management when she was going to be out sick.  (Plaintiff's Affidavit; Exh. 9, Par. 8, 12, 17;  FMLA Documentation and Medical Notes; Exh. 6; and Grievance Documents; Exh. 7)  See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

58.     The Plaintiff does not dispute the contents of Paragraph 54 of *Defendant's Facts* except insofar as she did explain the diabetes-related conditions to her mangers when she called in sick.  (Plaintiff's Affidavit;  Exh. 9, Par. 8, 12, 17)  In addition, the document contained in *Defendant's Exhibit J* indicates that the Plaintiff was given a written warning during FMLA-approved time on

May 26, 2000 and was suspended during FMLA-approved time from September 16, 2000 to

September 15, 2000.  (Miller Dep. pp. 58:3-59; Exh. 1)  See also, the facts set forth in

Paragraphs 125-141, which are incorporated herein by reference.

59.     The Plaintiff does not dispute the contents of Paragraph 54 of *Defendant's Facts* except

insofar as she did explain the diabetes-related conditions to her mangers when she called in sick.

(Plaintiff's Affidavit; Exh. 9, Par. 8, 12, 17)  In addition, the document contained in *Defendant's*

*Exhibit J* indicates that the Plaintiff was given a written warning during FMLA-approved time on

May 26, 2000 and was suspended during FMLA-approved time from September 16, 2000 to

September 15, 2000.  (Miller Dep. pp. 58:3-59; Exh. 1)  It is interesting to note that the

Defendant sent the Plaintiff documentation, which suggests a violation of the FMLA.  (FMLA

Documentation; Exh. 6)  See also, the facts set forth in Paragraphs 125-141, which are

incorporated herein by reference.

60.     The Plaintiff was consistently treated like a disciplinary problem instead of being treated

like an employee with a handicap.  (Plaintiff's Affidavit; Exh. 9, Par. 10, 11, 13, 18; and Miller

Dep. p. 132; Exh. 9)   The Plaintiff also reiterates and incorporates herein her position at

Paragraphs 10, 15, 23, 24, 48, 54, and 56.  See also, the facts set forth in Paragraphs 125-141,

which are incorporated herein by reference.

61.     The Plaintiff was consistently treated like a disciplinary problem instead of being treated

like an employee with a handicap.  (Plaintiff's Affidavit; Exh. 9, Par. 10, 11, 13, 18; and Miller

Dep. p. 132; Exh. 1)   She was denied accommodations for her handicap and as a result she was

unnecessarily disciplined for her attendance.  The "written" warning given to the Plaintiff was

indeed reduced to a lesser verbal warning but was accomplished due to intervention by the union

and their urging for the Verizon managers to do so.  See memorandum of verbal warning

attached to the *Defendant's Facts* as *Exhibit B*.  See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

62.     The Plaintiff was consistently treated like a disciplinary problem instead of being treated like an employee with a handicap.  (Plaintiff's Affidavit; Exh. 9, Par. 10, 11, 13, 18; and Miller Dep. p. 132; Exh. 1)   She was denied accommodations for her handicap and as a result she was unnecessarily disciplined for her attendance.  The Plaintiff reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 24, 48, 54, and 56. See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

63.     The Plaintiff was consistently treated like a disciplinary problem instead of being treated like an employee with a handicap.  (Plaintiff's Affidavit; Exh. 9, Par. 10, 11, 13, 18; and Miller Dep. p. 132; Exh. 1)   She was denied accommodations for her handicap and as a result she was unnecessarily disciplined for her attendance.  The Plaintiff reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 24, 48, 54, and 56.  See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

64.     The Plaintiff does not dispute the contents of Paragraph 64 of *Defendant's Facts.*

65.     The Plaintiff does not dispute the contents of Paragraph 65 of *Defendant's Facts*.

66.     The Plaintiff does not dispute the contents of Paragraph 66 of *Defendant's Facts.*

67.     The Plaintiff reiterates and incorporates herein her position at Paragraph 56.

68.     The Plaintiff was consistently treated like a disciplinary problem instead of being treated like an employee with a handicap.  (Plaintiff's Affidavit; Exh. 9, Par. 10, 11, 13, 18; and Miller Dep. p. 132; Exh. 1)   She was denied accommodations for her handicap and as a result she was unnecessarily disciplined for her attendance.  The Plaintiff reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 24, 48, 54, and 56.  See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

69.     The Plaintiff was consistently treated like a disciplinary problem instead of being treated like an employee with a handicap.  (Plaintiff's Affidavit; Exh. 9, Par. 10, 11, 13, 18; and Miller Dep. p. 132; Exh. 1)   She was denied accommodations for her handicap and as a result she was unnecessarily disciplined for her attendance.  The Plaintiff reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 24, 48, 54, and 56. See also, the facts set forth in Paragraphs 125-141, which are incorporated herein by reference.

70.     The Plaintiff reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 24, 48, 54, and 56.

## E.     PLAINTIFF'S TERMINATION

71.     The Plaintiff says that she was out sick on January 22, 2003 and the following day for a diabetes-related condition.  (Plaintiff's Affidavit; Exh. 9, Par. 15) The Plaintiff reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 24, 48, 54, and 56.  See also, the facts set contained in Paragraph 154, which is incorporated herein by reference.

72.     The Plaintiff does not dispute the alleged reason given to her for her termination, but she does say that the reasons for the termination were for her requesting accommodation and because the Defendant wanted to terminate her employment for her diabetic condition.  (Plaintiff's Affidavit; Exh. 9, Par. 18)  The Plaintiff reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 24, 48, 54, and 56.  The Plaintiff also pursued a grievance regarding her termination, but to no avail.  See also, the facts set forth in Paragraph 154, which is incorporated herein by reference.

## F.     PLAINTIFF'S UNION GRIEVANCES

73.     The Plaintiff does not dispute the contents of Paragraph 73 of *Defendant's Facts*.

74.     The Plaintiff does not dispute the contents of Paragraph 74 of *Defendant's Facts*, but adds that union representative, Kristina Santos, also informed management that it was the

union's position that "Kathy [was] not taking advantage and only staying [out of work] for length of her illness." (Defendant's Exh. R at VER0289)  Further, completely contrary to the assertions of the Defendant, the union and management of the Defendant were well aware of the Plaintiff's diabetes and diabetes-related conditions.  (Plaintiff's Affidavit; Exh. 9, Par. 4, 6, 8, 13, 15; Grievance Documentation; Exh. 7;  FMLA and Medical Documentation; Exh. 6)   The Plaintiff made requests for accommodation and those requests were flatly denied.  (Plaintiff's Affidavit;  Exh. 9, Par. 6, 13, 20)   See also, the facts set forth in Paragraphs 142-147, which are incorporated herein by reference.

75.    The Plaintiff does not dispute the contents of Paragraph 75 of *Defendant's Facts*, but adds that Hans Peterson also stated, prior to Kristina Santos response regarding Defendant's leniency, that "this is very serious and [the Plaintiff] needs to take care of her condition." (Defendant's Exh. S at VER0285)  Further, Hans went on to later say that "[the Plaintiff] has an ongoing condition we told her about clinic." (Defendant's Exh. S at VER0285) Further, completely contrary to the assertions of the Defendant, the union and management of the Defendant were well aware of the Plaintiff's diabetes and diabetes-related conditions. (Plaintiff's Affidavit; Exh. 9, Par. 4, 6, 8, 13, 15; Grievance Documentation; Exh.7; FMLA and Medical Documentation; Exh. 6)   The Plaintiff made requests for accommodation and those requests were flatly denied.  (Plaintiff's Affidavit; Exh. 9, Par. 6, 13, 20)  See also, the facts set forth in Paragraphs 142-147, 150-153, which are incorporated herein by reference.

76.    The Plaintiff does not dispute the contents of Paragraph 76 of *Defendant's Facts* as same pertains to the reduction of the suspension.  However, the balance of Paragraph 76 of *Defendant's Facts* are unsupported by the record and disputed, as follows:  The EAP was meant to help employees with "…stress, balancing the workload, family life…" and that the Plaintiff was asked to go to EAP because they "…thought it would be helpful for her to talk to

somebody…" (McDonald Dep. p. 18; Exh. 5)  The Plaintiff was also referred to the EAP, not

by her agreement, because of her alleged inability to deal with "time management" issues.  That

the EAP was not an appropriate referral for the Plaintiff is evidenced further by the July 31, 2002

document regarding the grievance meeting of same date wherein it indicates that "although

[Kathy] was offered EAP her condition did not fall under any category EAP covers."

(Defendant's Exh. D and Defendant's Exh. F at Paragraph 78)  Clearly, the cause of the absences

was not any lack of ability to address time management issues; rather, the Plaintiff had a medical

condition for which she needed a reasonable accommodation.  Certainly, to the Plaintiff's

knowledge, there were no medical doctors and there was no one in the EAP that was there to

speak with her about granting her an accommodation for her medical condition.  The Plaintiff

was, in fact, excused by her supervisor, Deborah McDonald, from attending the EAP for this

reason.  (Plaintiff's Affidavit; Exh. 9, Par. 13)  See also, the facts set forth in Paragraphs 142-

147, which are incorporated herein by reference.

77.     The Plaintiff does not dispute the contents of Paragraph 77 of *Defendant's Facts*.

## G.     PLAINTIFF'S REFERRALS TO THE EMPLOYEE ASSISTANCE PROGRAM

78.     As is noted above, the EAP was meant to help employees with "…stress, balancing the

workload, family life…" and that the Plaintiff was asked to go to EAP because they "…thought

it would be helpful for her to talk to somebody…" (McDonald Dep. p. 18; Exh. 5)  The Plaintiff

was also referred to the EAP, not for issues regarding her handicap or medical condition, because

of her alleged inability to deal with "time management" issues.  Further evidence that the EAP

was not an appropriate referral for the Plaintiff is shown in the July 31, 2002 document regarding

the grievance meeting of same date, wherein it indicates that, "although [Kathy] was offered

EAP her condition did not fall under any category EAP covers." (Defendant's Exh. D and

Defendant's Exh. F at Paragraph 78)  Clearly, the cause of the absences was not any lack of

ability to address time management issues; rather, the Plaintiff had a medical condition for which she needed a reasonable accommodation.  Certainly, to the Plaintiff's knowledge, there were no medical doctors and there was no one in the EAP that was there to speak with her about granting her an accommodation for her medical condition.  The Plaintiff was only once referred to the EAP toward the end of her employment with the Defendant.  On this occasion, the Plaintiff was, in fact, excused by her supervisor, Deborah McDonald, from attending the EAP for the reason that it was not appropriate under the Plaintiff's circumstances.  (Plaintiff's Affidavit; Exh. 9, Par. 13)  Melissa Morin, a union representative, indicated that what the Plaintiff truly needs is "an outside medical review" although EAP could be helpful in balancing her needs. (Defendant's Exh. S at VER0286)  Medical review is not part of the EAP, according to management. (McGovern Dep. p. 64; Exh. 2)  Rather, the administrator of the sickness disability plan or representatives of the Occupational Health Department would make determinations regarding handicap and base same on clinical medical evidence. (McGovern Dep. pp. 52-53; Exh. 2)  Deborah McDonald testified that the Plaintiff was asked to go to EAP because they "…thought it would be helpful for her to talk to somebody…" (McDonald Dep. p. 18; Exh. 5)  Also according to McDonald, the EAP was meant to help employees with "…stress, balancing the workload, family life…" (McDonald p. 18; Exh. 5)    EAP is recommended "to people that are struggling, trying to get work.  We recommend EAP to people having a difficult time doing their job." (McGovern Dep. pp. 60-61; Exh. 2)  The EAP pamphlet that Verizon provides to its employees indicates that the EAP program is for those employees who exhibit signs of chemical dependence or mental health issues. It is a counseling service.  According to the document, an employee can speak to an EAP counselor regarding: "marital issues, financial issues, child or elder issues, problems with co-workers, balancing work and family responsibilities, dealing with the stresses

in your life, and alcohol and drug abuse." (Defendant's Exh. F) See also, the facts contained in Paragraph 112-124, 142-147, which are incorporated herein by reference.

79.     The Plaintiff reiterates and incorporates herein her position at Paragraphs 76 and 78 above.

80.     The Plaintiff says that she was not referred the EAP on more than one occasion, as noted above. The Plaintiff reiterates and incorporates herein her position at Paragraphs 76 and 78.

81.     The Plaintiff says that she was not referred the EAP on more than one occasion, as noted above. The Plaintiff reiterates and incorporates herein her position at Paragraphs 76 and 78.

82.     The Plaintiff says that she was not referred the EAP on more than one occasion, as noted above. The Plaintiff reiterates and incorporates herein her position at Paragraphs 76 and 78.

83.     The Plaintiff says that she was not referred the EAP on more than one occasion, as noted above. The Plaintiff reiterates and incorporates herein her position at Paragraphs 76 and 78.

## H.     PLAINTIFF'S ALLEGED REQUESTS FOR ACCOMODATIONS

84.     The Plaintiff spoke to her manager, Sally Sullivan, regarding three different accommodations, all of which were denied, including: (1) to take personal or vacation time instead of a sick day, (2) to reduce her work schedule so that she could come in late on the days that she was ill (see discussion at Paragraph 40), or (3) switch to part-time employment for a definite period of time. (Miller Dep. pp. 147-148; Exh. 1; and Plaintiff's Answers to Defendant's Interrogatory Nos. 9 and 10; Exh. 10) The Defendant's management indicated that they knew nothing of the Plaintiff's diabetes or the absences related to diabetes. Raposa testified that "If someone was out sick and they are coming back they may ask for a reduced work schedule…" (Raposa Dep. pp. 63-64; Exh. 3) The Plaintiff spoke to her manager, Deborah McDonald, regarding whether it would be acceptable for her to come in two hours late to work and not have to call the 800 number because once she called the 800 number she had to

recommence the FMLA process.  The Plaintiff was told that she had to call the 800 number and then be out the entire day. The Plaintiff also asked if she could take days off without pay on days she was sick and was also denied this request.  (Miller Dep. pp. 136-138; Exh. 1)  The Plaintiff also reiterates and incorporates her position at Paragraphs 10 and 40.  See also, the facts contained in Paragraphs 112-124, 150-153, which are incorporated herein by reference.

85.     The Plaintiff reiterates and incorporates herein her position at Paragraph 84.

86.     The Plaintiff was not given the opportunity to provide her manager, Sally Sullivan, with details regarding how long a period she believed she would come into work late since, "the conversation never went that far because it was not an option.  There was not anything to discuss." The request was flatly denied and Sullivan was not going to discuss it any further. (Miller Dep. p. 151; Exh. 1)  See also, the facts contained in Paragraphs 112-124, 150-153, which are incorporated herein by reference.

87.     The Plaintiff does not dispute the contents of Paragraph 87 of *Defendant's Facts*.

88.     The Plaintiff does not dispute the contents of Paragraph 88 of *Defendant's Facts*, but also reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 40 and 84.

89.     The Plaintiff was not given the opportunity to provide her manager, Sally Sullivan, with details regarding how long a period she believed she would come into work late since "the conversation never went that far because it was not an option.  There was not anything to discuss." The request was flatly denied and Sullivan was not going to discuss it any further. (Miller Dep. p. 151; Exh. 1)   The Plaintiff reiterates and incorporates herein her position at Paragraphs 84 and 86.

90.     The Plaintiff does not dispute the contents of Paragraph 90 of *Defendant's Facts*, but adds that there exists conflicting opinions among the Defendant's managers relative to the interpretation of the terms and conditions of the Collective Bargaining Agreement ("CBA"), as

follows:  Paula Raposa indicated that "a person is allowed to use their vacation time for their own private means." (Raposa Dep. p. 58; Exh. 3)  Mary Ellen Wood indicated that an employee could use personal or vacation days if sick. (Wood Dep. p. 73; Exh. 4)  Paul McGovern took the opposite position, in that he indicated that, "vacation time cannot be substituted for time when an employee is sick." (McGovern Dep. p. 89; Exh. 2)  See also, the facts contained in Paragraphs 112-124, which are incorporated herein by reference.

91.     The Plaintiff does not dispute the contents of Paragraph 91 of *Defendant's Facts*.

92.      The Plaintiff reiterates and incorporates herein her position at Paragraph 90.

93.     The Plaintiff reiterates and incorporates herein her position at Paragraph 90.

94.     The Plaintiff says that she was not suggesting anything inappropriate in terms of how the Defendant was going to characterize her time off.  In addition, the Defendant had retroactively characterized her time in the past.  (Plaintiff's Affidavit; Exh. 9)  The Plaintiff reiterates and incorporates herein her position at Paragraph 84 and 90.  See also, the facts contained in Paragraphs 112-124, which are incorporated herein by reference.

95.     The Plaintiff says that she was not suggesting anything inappropriate in terms of how the Defendant was going to characterize her time off.  In addition, the Defendant had retroactively characterized her time in the past.  (Plaintiff's Affidavit; Exh. 9)  The Plaintiff reiterates and incorporates herein her position at Paragraphs 84 and 90.

96.     The Plaintiff may not have spoken to her doctors specifically regarding a possible accommodation, but they were aware of the time she was out of work as she usually contacted them each time she had to call out sick.  (Miller Dep. pp. 154-155; Exh. 1)  The FMLA and medical documentation supports the fact that the Plaintiff's reasons for being absent were connected to her diabetes.  (FMLA Documentation and Medical Documentation; Exh. 6; and Grievance Documentation; Exh. 7)

## I.     LACK OF DISCRIMINATORY ANIMUS

97.     Proof of the Defendant's discriminatory animus is riddled throughout the record, including but not limited to, the following: (1) having knowledge of the Plaintiff's disability and need for a reasonable accommodation yet failing to provide same; (2) disciplining the Plaintiff for absences that occurred during FMLA-approved time; and (3) treating the Plaintiff as if she were a disciplinary problem instead of one with a disability in repeated referral and ultimate job assignment to EAP, a service offered by the employer that dealt with alcohol and drug abuse and psychological issues.   The Plaintiff also reiterates and incorporates herein her position at Paragraphs 10, 15, 23, 24, 27, 40, 48, 54, 56, 74-78, 83-86.

98.     The Plaintiff also reiterates and incorporates herein her position at Paragraph 97.

99.     The Plaintiff also reiterates and incorporates herein her position at Paragraph 97.

100.    The Plaintiff also reiterates and incorporates herein her position at Paragraph 97.

## J.     LACK OF EVIDENCE OF RETALIATION

101.    The Plaintiff reiterates and incorporates herein her position at Paragraphs 72, 78, 83, 84, and 86.

102.    The Plaintiff does not dispute the contents of Paragraph 102 of *Defendant's Facts.*

103.    The Plaintiff reiterates and incorporates herein her position at Paragraphs 72, 78, 83, 84, and 86.

104.    The Plaintiff does not dispute the contents of Paragraph 104 of *Defendant's Facts.*

105.    The Plaintiff was retaliated against and disciplined in the form of termination from her employment.  (Plaintiff's Affidavit; Exh. 9, Par. 18)  The Plaintiff reiterates and incorporates herein her position at Paragraphs 72, 78, 83, 84, and 86.

## K.     MS. MILLER'S EMPLOYABILITY

106.    The Plaintiff does not dispute the contents of Paragraph 106 of *Defendant's Facts.*

107.    The Plaintiff does not dispute the contents of Paragraph 107 of *Defendant's Facts* but adds that the owner of Magic Wings is the Plaintiff's father and that she still has the same symptoms of diabetes for which she has had to take time off.  The Plaintiff continues to suffer a substantial impairment of major life activities, for which she requires accommodation with her current employer. (Plaintiff's Affidavit; Exh. 9, Par. 21, 22; and Miller Dep. pp. 15-16; Exh. 1) See also, the facts contained in Paragraph 111, which are incorporated herein by reference.

108.    The Plaintiff does not dispute the contents of Paragraph 108 of Defendant's Facts.

## L.    ADDITIONAL MATERIAL FACTS IN DISPUTE OF PLAINTIFF

### A. Plaintiff's Handicap

109.    The Plaintiff has diabetes, but she also has medical conditions that are related to her diabetes.  She takes medication for her kidneys, and her triglycerides run high.  This was related to her diabetes. (Miller Dep. p. 21; Exh.1) The Plaintiff had to take medicine that is in part for her diabetes.  She also has to control her diet and she must get sufficient rest and control her stress level.  She also has to get sufficient exercise and avoid any cuts. (Miller Dep. pp. 76-80; Exh.1) The Plaintiff had been hospitalized for diabetes approximately four times.  She was hospitalized for her reaction to medication she was taking for her diabetes.  (Miller Dep. pp. 88-89; Exh.1)  There were a few times during this time period where the Plaintiff was totally debilitated and she had to have her mother come over and take care of her. (Miller Dep. p.106; Exh.1)

110.    As a result of her sickness related to her diabetes, the Plaintiff was unable to shower on many occasions. (Miller Dep. p. 99; Exh.1) The Plaintiff's ability to drive was impaired. (Miller Dep. p. 31-32; Exh.1)  The Plaintiff's ability to travel was affected by her diabetes.  Her driving was also affected.  (Miller Dep. pp. 89-94; Exh.1) She also had to watch her diet and blood sugar levels by making sure she ate when necessary. (Miller Dep. pp. 103-105; Exh.1)  The Plaintiff

stated that during this four-year period her daily life activities were limited. (Miller Dep. p. 101; Exh.1) The Plaintiff could not do basic things like shop, socialize, do general housework, etc., when her diabetes was affecting her during this four-year period. (Miller Dep. p. 105; Exh.1) With the Plaintiff's diabetes, it is not advisable that she have children. (Miller Dep. p.107; Exh.1) The Plaintiff also suffered from Insulin Resistance Disorder. This changes the Plaintiff's body temperature in drastic ways and she could not go to any place that was too hot or too cold for long periods of time. (Miller Dep. pp. 103-105; Exh.1) During the one year before and the three years after her diagnosis, the Plaintiff felt sick almost on a daily basis due to her diabetes. These dates correspond with the dates she was out of work and other dates as well. (Miller Dep. pp. 97-100; Exh.1)

111.    When the Plaintiff went into work, the Plaintiff was able to do her job. (Miller Dep. pp. 106-107; Exh.1) The Plaintiff was absent form Magic Wings for her diabetes about four times in 2005 and two days so far in 2006. (Miller Dep. p. 81; Exh.1)  Since the Plaintiff was first diagnosed with diabetes, she has been able to control her life and symptoms a little better. (Miller Dep. pp. 95-99; Exh.1)

### B.  Requests for Accommodation

### 1. In General

112.    McGovern did not know whether the Plaintiff had asked for an accommodation for her diabetes. (McGovern Dep. pp. 59-60; Exh. 2) McGovern said that he would have to defer to a medical person to determine whether an accommodation should be made for diabetes. [Note: there are no doctors at the EAP] (McGovern Dep. pp. 62-63; Exh. 2) McGovern admitted that there are circumstances where diabetes can give rise to the need for accommodation—such as a change in schedule or work hours for medical reasons. He acknowledged that there could be complications of diabetes. (McGovern Dep. pp. 62-65; Exh. 2)

113.     McGovern said that Aetna would make the determination as to whether or not an

accommodation should be granted and that it would be their job to make a "medical

determination" as to whether or not the Plaintiff needed an accommodation.  This contact person

would be the administrator of the company's sickness and accident disability plan, which is not a

part of the EAP.  He did not know who this individual was at the time that the Plaintiff was

employed at Verizon. (McGovern Dep. pp. 66-67; Exh. 2)   McGovern stated that he was not

"particularly aware" that the Plaintiff identified herself as needing an accommodation.

(McGovern Dep. p. 147; Exh. 2)

114.     McGovern acknowledged that he Plaintiff may have had medical conditions which rose

to the level of a disability.  And "individualized attention" is given to that employee. (McGovern

Dep. p. 150; Exh. 2)  McGovern said that the Plaintiff was accommodated for her disability.  But

yet he said that she never disclosed a disability or requested an accommodation. (McGovern

Dep. p. 151; Exh. 2)  The "accommodations" that McGovern refers to having been provided to

the Plaintiff did not relate to her diabetes.  He stated that the Plaintiff did not express her needs in

terms of a diabetic condition. (McGovern Dep. p. 152; Exh. 2)  McGovern said that the

Plaintiff's managers were not charged with reviewing the Plaintiff's medical condition or

accommodation needs. (McGovern Dep. p. 223; Exh. 2)

115.     Raposa said that the Plaintiff never asked for an accommodation for her diabetes, but she

outlined what she would do in that event. (Raposa Dep. pp. 70-73; Exh. 3)  Raposa said that the

Plaintiff never asked for an accommodation for a handicap. (Raposa Dep. p. 70-73; Exh. 3)

Raposa would not know what the company would need in terms of medical documentation for an

accommodation. (Raposa Dep. p. 100; Exh. 3)  Raposa was unaware of any accommodation

having been requested by the Plaintiff. (Raposa Dep. p. 126; Exh. 3)  See also, the facts set forth

in Paragraphs 6, 10, 13, 15, 56, 78, 84, 86, 90, 94, which are incorporated herein by reference.

116.    Wood did not know if the Plaintiff had ever asked for an accommodation for diabetes. (Wood Dep. pp. 62-63; Exh. 4)  Wood did not know or was unclear as to the process for requesting an accommodation for a handicap—she was very hazy on the subject.  (Wood Dep. pp. 74-77; Exh. 4)

### 2.  Modified Work Schedule

117.    The Plaintiff asked Sally Sullivan for an accommodation.  Sally Sullivan was the second supervisor in August and September of 2001.  The Plaintiff asked for the ability to come in two hours late and not take the whole day off, and to not call the "800 number".  She also asked not to get paid on the days she was out sick. (Miller Dep. pp. 136-140; Exh. 1)  Ms. Sullivan never explained to the Plaintiff the reasoning for her refusal to allow the Plaintiff to come in at 11:00 am on occasions instead of taking the entire day off.  Ms. Sullivan refused any further dialogue on the subject.  The Plaintiff also discussed working part-time as well, but that was not an option either. (Miller Dep. p. 142; Exh. 1)  As part of her accommodation the Plaintiff was merely requesting to adjust her hours for a specific period of time. (Miller Dep. p. 142; Exh. 1)

118.    McGovern clearly stated that non-management employees were allowed to modify their work schedules.  Service Representatives have been allowed this accommodation.  In fact, McGovern indicated that that Defendant goes through this process on a regular basis. (McGovern Dep. pp. 51-54; Exh. 2)  McGovern clearly stated that there were circumstances where non-management employees were given modified schedules for "medical needs." (McGovern Dep. p. 52; Exh. 2)  McGovern then indicated that he did not read the attendance policy to mean that employees could not take time off for a reasonable accommodation for a handicap.  And, the policy does not mean to McGovern that an employee cannot receive a modified work schedule. In fact, modified work schedules have been granted. (McGovern Dep. pp. 146-147; Exh. 2)

McGovern was unsure as to whether the Plaintiff was considered for a change in schedule. (McGovern Dep. pp. 160-161; Exh. 2)

### 3. Use of Vacation Time/Personal Time

119.    The Plaintiff asked Hans Peterson him for an accommodation in terms of a modified schedule.  The Plaintiff had another conversation with him prior to her being suspended for her final absence.  He was not very receptive to the Plaintiff.  This occurred in January of 2003 and prior to the 22nd of January.  The Plaintiff in that meeting asked Mr. Peterson if she could use personal time or vacation that the Plaintiff had available to her, instead of using sick time, thereby avoiding a suspension.  Mr. Peterson said "no". (Miller Dep. pp. 117,118,119,121; Exh. 1)

120.    The Plaintiff is aware of instances where other employees were allowed to use personal and vacation time instead of taking sick time. (Miller Dep. pp. 121-123; Exh. 1)  As for the request for accommodations, the Plaintiff also asked to use vacation time and personal time instead of using sick time as noted above.  Lynn Supernot felt that this was a reasonable request for accommodation and they both went to Hans Peterson with the request.  This request was made sometime between January 1st of 2003 and January 22nd of 2003.  Lynn Supernot was the plaintiff's union representative. (Miller Dep. pp. 144-145; Exh. 1)  The Plaintiff's request was denied.

121.    McGovern was unaware of any policy that applied to the Plaintiff regarding taking personal time off. (McGovern Dep. p. 88; Exh. 2)   McGovern said that vacation time cannot be substituted for time when an employee is sick. (McGovern Dep. p. 89; Exh. 2)  McGovern said that he did not know whether the Plaintiff violated any vacation time policy. (McGovern Dep. p. 90; Exh. 2)  McGovern did not know whether the Plaintiff used her vacation time as personal days for her diabetes.  McGovern did not know whether she (the Plaintiff) took any days off for

her diabetes.  And, McGovern had looked into these matters with the records.  But yet McGovern then indicated that the attendance records reflected her diabetes. (McGovern Dep. pp. 92-95; Exh. 2)  McGovern said that an employee cannot use vacation time if the employee is sick. (McGovern Dep. p. 218; Exh. 2)  McGovern also said that an employee cannot use personal time if she or he is sick.  He then retracted that statement and said that he was not sure whether or not personal time could be used for sick time. (McGovern Dep. p. 220; Exh. 2)

122.    According to Raposa, the Plaintiff could have used vacation time for being out sick. (Raposa Dep. pp. 57-58; Exh. 3)  According to Raposa, employees were allowed to take personal days as well for sick time. (Raposa Dep. p. 58; Exh. 3)  Raposa indicated that there were exceptions in the attendance policy for being ill. (Raposa Dep. p. 59; Exh. 3)  Raposa said the process for requesting an accommodation is to go through Aetna or MetLife. (Raposa Dep. p. 65; Exh. 3)

123.    Wood said that a person who has a physical impairment can use a vacation day if time is available.  The Plaintiff could have used personal days or vacation sick days for any type of physical problem that she had. (Raposa Dep. pp. 73-74; Exh. 3)

### 4. Work-from-Home

124.    McGovern did allow certain employees to work from home on the past.  Handicapped employees were allowed to work from home. (McGovern Dep. pp. 47-49; Exh. 2)  Doreen Smith, an employee manager was allowed to work from home.  Her managers were involved in providing this accommodation.  She had complications with Polio. (McGovern Dep. pp. 47-49; Exh. 2)  McGovern could not say whether it was possible for a non-management employee like the Plaintiff to work from home.  In fact, McGovern indicated that under the circumstances that could be possible. (McGovern Dep. pp. 50-52; Exh. 2)

### C. **Plaintiff's Absences**

#### 1. **Reasons for Absences**

125.    When the Plaintiff called her supervisors, she would explain the specific reasons why her diabetes was causing her not to come into work. (Miller Dep. p.192; Exh. 1)  The Plaintiff would give very specific details about why she was going to be out sick, although the Union felt as though she should not have to provide such detailed medical documentation.  But the Plaintiff, nonetheless, would provide detailed information to management regarding her symptoms and her diabetes-related condition. (Miller Dep. pp.127-129; Exh. 1)  The Plaintiff always gave the Defendant as much notice as she could when she was going to be sick.  The Defendant's management gave her attitude when she called in sick. (Miller Dep. p.165; Exh. 1)   The Plaintiff was not attempting to get out of work with some "malicious intent," and she felt like she was being punished for being sick, which was beyond her control.  She was being treated like a malingerer when that was not the case at all. (Miller Dep. pp.131-132; Exh. 1)

126.    McGovern clearly stated that the Plaintiff was absent from work and that none of those absences related to her diabetes. (McGovern Dep. p.55; Exh. 2)  McGovern then testified that it was known that the Plaintiff had diabetes throughout a significant portion of the time when she was on progressive discipline for absenteeism.  But McGovern indicated that none of the Plaintiff's absences were related to her diabetes. (McGovern Dep. pp.56-58; Exh. 2)  McGovern did not believe that anyone considered the Plaintiff to be handicapped because she called in sick for things like a sore throat, unrelated to her diabetes according to him. (McGovern Dep. p.59; Exh. 2)  The Plaintiff's managers knew that she had diabetes according to McGovern, but that none of her absences were related to diabetes. (McGovern Dep. p.58; Exh. 2) McGovern agreed that if the Plaintiff was having side effects from the diabetes medication that was causing her

absences, it would be important for management to know this in terms of providing an accommodation. (McGovern Dep. p. 213; Exh. 2)

127.     McGovern said that he had access to the records that would show what the Plaintiff maintained was the specific condition as the reason for her absence. (McGovern Dep. p. 99; Exh. 2)  McGovern did not know the reasons why the Plaintiff was absent from work. (McGovern Dep. pp. 104-105; Exh. 2)   McGovern stated that "a disability is not an excuse for poor attendance or the reason for the company to waive its attendance requirements." (McGovern Dep. pp. 124-125; Exh. 2)  As part of McGovern's investigation, he did not know whether the Plaintiff's absences between March 2002 and February 2003 were diabetes-related. (McGovern Dep. pp. 134-135; Exh. 2)   McGovern said that with absences due to a medical condition, the Defendant makes an effort to secure medical review to see if there are issues that require management to help improve employee attendance. (McGovern Dep. p. 147; Exh. 2)

128.     Raposa was not sure if the reasons for absence were related to the Plaintiff's diabetes. (Raposa Dep. p. 144; Exh. 3)

### 2.  Discipline relating to Absences/Attendance Policy

129.     The Plaintiff was actually taking less time than she was allotted for sick days. Management changed her from a written warning to a verbal warning. (Miller Dep. pp. 60-61; Exh. 1)  The Plaintiff was suspended two times—once on or about August 23 and once on October 5, 2001 for 30 days.  The Union found in her favor on the second suspension. (Miller Dep. pp. 63-64; Exh. 1)  The Plaintiff was also given a written warning on or about July 5, 2001 for being out sick.  (Miller Dep. p. 63; Exh. 1)  The Plaintiff was suspended on July 8, 2002 for thirty days for a non-diabetic related absence.  She had fallen down stairs and had an ovarian cyst.  The Plaintiff had no choice but to go to the hospital.  (Miller Dep. pp. 66-67; Exh. 1)   The Plaintiff received final warnings sometime if June 2002 for absenteeism. (Miller Dep. p.69; Exh.

1)  The Plaintiff's final suspension was received in February of 2003, also for absenteeism.

(Miller Dep. p.69; Exh. 1)

130.     Hans Peterson was clearly upset with the Plaintiff for needing time off for sick days

(related to her diabetes) and he conveyed as much to others. (Miller Dep. pp. 122-123; Exh. 1)

There were others who were absent as much as the Plaintiff and did not get fired.  Their names

are: Linda Picard, Dave Maziar, Barb Speight, Dave Trudeau, and Luanne McCloskey. (Miller

Dep. pp. 166-167; Exh. 1)  Barb Speight was out frequently for substance abuse rehab.  Dave

Mazier was out a significant time for the same reasons.  Linda Picard was out for a significant

time for the same reasons. (Miller Dep. pp. 169-170, 172; Exh. 1)  Luanne McCloskey had

carpel tunnel and back pain and she was fired. (Miller Dep. p. 173; Exh. 1)  Rene Stewart was

another employee with attendance issues. (Miller Dep. p. 175; Exh. 1)

131.     Wood never has any knowledge of why an employee is out of work.  The employee

would have to call the local attendance manager to report out sick—it was Paula Raposa for the

Plaintiff.  (Wood dep. pp. 78-80; Exh. 4)  According to Wood, the Plaintiff was terminated for

poor attendance and Wood reviewed certain documentation regarding the Plaintiff's termination,

including FMLA documentation.  Wood did not review the Plaintiff's complete personnel file.

(Wood Dep. pp. 11-12; Exh.4)  Hans Peterson started the termination process, according to

Wood. (Wood Dep. p. 30; Exh.4)  Paula Raposa was the attendance manager for the Plaintiff in

Springfield, at the time of the Plaintiff's termination of employment.  Hans Peterson was the call

center manager. (Wood Dep. pp. 42-43; Exh.4) With regard to the absence that led to the

Plaintiff's termination, Wood did not know whether the Plaintiff was out sick as a result of her

diabetes. (Wood Dep. p. 47; Exh.4)  Hans Peterson agreed with the termination. (Wood Dep. p.

50; Exh.4)

132.     McGovern did an investigation regarding the Plaintiff's discrimination claims and concluded that the Plaintiff was properly terminated because she allegedly failed to provide "good attendance."   McGovern believed, based upon conversations with management, that none of her absences were diabetes-related.  Ellen Wood and Paula Raposa told him this, but the issue of diabetes never came up in the conversation. (Wood Dep. pp. 61-63; Exh. 4)

133.     McGovern said that "aggressive discipline starts to apply at the discretion of management when they feel that counseling has not taken the required affect…it's a matter of management discretion." (McGovern Dep. p. 91; Exh. 2)  According to McGovern, the attendance policy and resulting discipline does not apply to a handicapped employee. (McGovern Dep. p. 150; Exh. 2) McGovern indicated that enforcement of the attendance policy is discretionary. (McGovern Dep. p. 191; Exh. 2)

134.     McDonald was involved in documenting the Plaintiff's absences. (McDonald Dep. pp. 6-7; Exh. 5)  McDonald did not remember why the Plaintiff was absent from work. (McDonald Dep. p. 7; Exh. 5)  McDonald doesn't know why the Plaintiff was terminated. (McDonald Dep. p. 7; Exh. 5)  McDonald doesn't know who made the decision to terminate the Plaintiff. (McDonald Dep. pp. 7-8; Exh. 5)  The Plaintiff would have to talk to the managers about calling out sick, but McDonald does not remember as to the Plaintiff about the reasons she was out sick. (McDonald Dep. pp. 7-8; Exh. 5)  McDonald did not know whether the Plaintiff was reprimanded or suspended.  (McDonald Dep. pp. 26-27; Exh. 5)

135.     Paula Raposa was the attendance manager. (Raposa Dep. p. 11; Exh. 3)  Raposa said if an absence is not approved under the FMLA, then disciplinary action is taken. (Raposa Dep. p. 29; Exh. 3) Raposa gave a recommendation regarding discipline concerning the Plaintiff. (Raposa Dep. p. 12; Exh. 3)  According to Raposa, the attendance policy does not allow for sick time.  If an employee calls out ill, they will be paid for their sick time and it would be reviewed under the

"policy." (Raposa Dep. p. 57; Exh. 3)  Raposa could not say whether the Springfield facility was at risk of failing to meet service requirements as a result of Kathleen Miller having been absent, but she said as much in her Affidavit. (Raposa Dep. p. 75; Exh. 3)  The Plaintiff did not risk meeting any standards or requirements that she was aware of. (Raposa Dep. pp. 76-77; Exh. 3)  According to Raposa suspension time could vary based on past practices and other factors. (Raposa Dep. p. 90; Exh. 3)  Raposa doesn't recall the particulars of the Plaintiff's termination of employment or the documents Raposa reviewed in this regard. (Raposa Dep. pp. 112-113; Exh. 3)

136.    When asked whether time off for a disability could result in termination, Raposa said an employee may not be disciplined if they "let us know." (Raposa Dep. pp. 118-119; Exh. 3)  Raposa could not answer whether, if an employee is out of work for a handicap—related condition, the employee would have an attendance occurrence held against her or him. (Raposa Dep. pp. 122-126; Exh. 3)  The Plaintiff's attendance documents are inaccurate with respect to the Plaintiff according to Raposa. (Referring to a "counseling step" issued to the Plaintiff.)  Judy Corbett wrote this statement and she was a team coach. (Raposa Dep. pp. 127-129; Exh. 3)  Raposa was not familiar with the attendance policy that was used to discipline the Plaintiff. (Raposa Dep. p. 139; Exh. 3)  Raposa did not know who terminated the Plaintiff's employment. Raposa may have spoken to Hans Peterson but she said "I don't terminate people without having a higher authority review it," but she doesn't know who that "higher authority" was with regard to the Plaintiff's termination. (Raposa Dep. pp. 162-164; Exh. 3)

## D.  <u>Time under FMLA</u>

137.    The Plaintiff discussed her request for accommodations with her doctor and her doctor filled out the FMLA forms that went to the company.  The company was constantly informed about the Plaintiff's medical condition relating to her diabetes. (Miller Dep. pp. 155-157; Exh. 1)

The Plaintiff was suspended and/or reprimanded while on approved FMLA leave. (Miller Dep. pp. 58-60; Exh. 1)  The Plaintiff spoke with her supervisor, Claire Gorski, about 50 times regarding her diabetes-related absences and conditions. (Miller Dep. p. 125; Exh. 1) The "800 number" was completely automated.  But then after the Plaintiff would call the FMLA "800 number" the Plaintiff would call her supervisor, who at one point was Claire Gorski. (Miller Dep. pp. 127-129; Exh. 1)

138.    McGovern said that the Plaintiff had unprotected absences and that "unprotected absences" are absences not covered under the FMLA. (McGovern Dep. p. 90; Exh. 2) McGovern said that he would have to look at the FMLA paperwork to see why the Plaintiff was out under FMLA. (McGovern Dep. pp. 94-95; Exh. 2)  McGovern was firm that the Verizon examined the reasons why the Plaintiff was out of work from a medical perspective—"From an FMLA point of view certainly."  There is a medical review as part of the FMLA process and this medical review would cover the reasons for the absence.  McGovern said that he had not looked at those records for the Plaintiff for 3 years.  He then said that he did not recall if he had ever reviewed the Plaintiff's FMLA records containing the medical review.  The FMLA review of the Plaintiff's condition was the only medical review that was done by the Defendant.  McGovern did not know how many reviews there were (medical) for the Plaintiff.  According to McGovern the absence benefit center, which is part of the Defendant company, did the medical reviews for the Plaintiff. (McGovern Dep. pp. 101-105; Exh. 2)

139.    McGovern did not recall what the FMLA medical review for the Plaintiff stated. (McGovern Dep. pp. 103-104; Exh. 2) McGovern said he reviewed FMLA documentation contained in the Plaintiff's personnel file.  He also reviewed the FMLA medical documentation for the Plaintiff.  He said that the Plaintiff failed to engage in the interactive process of accommodation. (McGovern Dep. pp. 109-110; Exh. 2)  McGovern did not know why the

Plaintiff took FMLA leave, which was taken on more than one occasion. (McGovern Dep. pp. 111-112; Exh. 2) McGovern clearly stated that if an employee exhausted the FMLA leave and needed some additional leave for a diabetes-related condition beyond the FMLA time that had already been exhausted, that would be a reasonable request. (McGovern Dep. p. 121; Exh. 2) McGovern stated that he was not sure that managers of the Defendant knew about the Plaintiff's diabetic condition or when they knew [even though he reviewed the FMLA documentation and the grievance documents]. (McGovern Dep. p. 122; Exh. 2) McGovern indicated that managers of the Defendant recorded the Plaintiff's reasons for being out on FMLA documentation and as part of the grievance documents. (McGovern Dep. p. 203; Exh. 2)

140.    Raposa did not know why the Plaintiff was on FMLA leave. (Raposa Dep. p. 145; Exh. 3) Raposa did not know whether management was aware or received the FMLA documentation submitted by the Plaintiff is related to the Plaintiff. Raposa also was aware that the Plaintiff had diabetes. (Raposa Dep. p. 169; Exh. 3) She did not know the FMLA approval process for the time that Kathleen Miller was employed there. (Raposa Dep. p. 171; Exh. 3) If an employee called out ill then they are paid, but there is "no sick time." It's just FMLA time according to Raposa. (Raposa Dep. pp. 116-117; Exh. 3)

141.    Wood doesn't know why the Plaintiff took FMLA leave for diabetes. (Wood Dep. p. 22; Exh. 4) Wood said she never spoke to the Plaintiff. (Wood Dep. p. 22; Exh. 4)

### E.  EAP/Union Grievances

142.    At first, the Plaintiff was told that she was required to attend EAP or she would be suspended, but her supervisor, Debbie McDonald, said "don't worry about it; you're not going to be suspended." It was about November of 2002 that the Plaintiff was told to go to the EAP. (Miller Dep. pp. 52-56; Exh. 1) The Plaintiff said she did not want to go to the EAP because they (the Defendant) felt like it was a time management issue. The Plaintiff was under the

impression that she would not be suspended or adversely affected for not going to the EAP. (Miller Dep. pp. 54-55; Exh. 1)  The Plaintiff also spoke to several people in the Union regarding her diabetes. (Miller Dep. p. 130; Exh. 1)

143.    McGovern said that the Defendant referred the Plaintiff to the EAP to get a medical evaluation to see whether a reasonable accommodation could be reached given the "attendance difficulty." (McGovern Dep. pp. 41-42; Exh. 2)  In order to determine whether diabetes amounted to a handicap, medical evidence would have to be reviewed by the administrators of the sickness disability plan or representatives of the occupational health department.  As to the Plaintiff, this was not done.  McGovern stated that referral to the EAP was the start of that process to determine whether in accommodation should be given. (McGovern Dep. pp. 53-54; Exh. 2)  According to McGovern, Hans Peterson was part of the process of referring the Plaintiff to the EAP. (McGovern Dep. p. 54; Exh. 2)  McGovern stated that the referral to the EAP would determine whether there were medical reasons for an accommodation. (McGovern Dep. p. 54; Exh. 2)  The EAP, to McGovern's knowledge, has never assisted anyone with diabetic-related issues. (McGovern Dep. pp. 74-75; Exh. 2)

144.    According to McGovern, what that Defendant did with the information about the Plaintiff's diabetes was to send her to the EAP. (McGovern Dep. p. 68; Exh. 2)  McGovern did not know when the Plaintiff was referred to the EAP but stated that the EAP would define the range of issues, "medical", etc.  That would include referring the employee to medical review of accommodation.  That medical referral could be to the Aetna. (McGovern Dep. pp. 68-69; Exh. 2)  McGovern said that part of the reason that the Plaintiff was being referred to the EAP was to determine if her medical condition, including her diabetes was impacting her ability to work. (McGovern Dep. p. 70; Exh. 2) McGovern then testified that the EAP program "can include referral to the proper resources for interactive review for possible accommodation." (McGovern

Dep. p. 74; Exh. 2) McGovern admitted that the Plaintiff was not referred for medical review in the medical department (as per Section 10 of the Defendant's policy)  McGovern said that the Plaintiff was referred to the EAP for a health evaluation. (McGovern Dep. pp. 199-202; Exh. 2) According to McGovern again, the Plaintiff was sent to the EAP for a medical evaluation. (McGovern Dep. p. 243; Exh. 2)

145.    McGovern then said did not even know why the Plaintiff was referred to the EAP.  "It might have been medical," he said.  He also said "It might have been behavioral."  But he was sure that the referral to the EAP was not about diabetes.  He said that even at this point, the Defendant did not know about the diabetes. (McGovern Dep. pp. 215-218; Exh. 2)  According to McGovern, the Defendant did not know about the diabetes before they referred the Plaintiff to the EAP. (McGovern Dep. p. 207; Exh. 2)  McGovern stated that the Plaintiff was ordered to go to the EAP and did not go and, therefore, she was insubordinate. (McGovern Dep. p. 54; Exh. 2) The Plaintiff was not terminated for not going to the EAP, nor was she disciplined for it. (McGovern Dep. p. 211; Exh. 2)  McGovern was not aware whether anyone at Verizon was aware of the Plaintiff's diabetes at the point at which she was referred to the EAP, but the Plaintiff was referred to the EAP at the end of her employment and the Defendant's management knew of her diabetes for years at that point. (McGovern Dep. p. 55; Exh. 25)  McGovern did not know whether any other employees were job assigned to the EAP. (McGovern Dep. p. 87; Exh. 25)

146.    When McGovern was asked whether the EAP was the only avenue by which Verizon could have gained insight into the Plaintiff's medical condition he stated that there were other ways such as from the Plaintiff herself.  McGovern did not know whether the Plaintiff telling management about her diabetes would have avoided the EAP referral, but he thought that under those circumstances, the EAP referral could have been avoided.  (McGovern Dep. pp. 229-230;

Exh. 2)  McGovern said that the grievance fact sheets did not relate to diabetes. (McGovern Dep. pp. 184-189; Exh. 2)  McGovern said that the records relating to grievances do not contain references to the Plaintiff's having been absent for a diabetic condition.  Management would have been notified by the Union had the Plaintiff brought diabetes up in her grievances. (McGovern Dep. pp. 206-207; Exh. 2)  McGovern believed that had the Union been aware of the Plaintiff's diabetes, they would have informed management and there would have been a review done. (McGovern Dep. p. 210; Exh. 2)

147.     Raposa said she would to refer to an employee with a medical handicap request for accommodation to the EAP, but she was not sure if EAP would actually make a medical accommodation or what they would do. (Raposa Dep. pp. 73-75; Exh. 3)

148.     Wood heard the Plaintiff's grievance at the second step.  She was a district manager who heard grievances at the second step.  Wood denied the grievance at the second step, which affirmed the termination, which was effective February 11, 2003.  (Wood Dep. p. 14; Exh. 4) Wood did not see a reference to the Plaintiff's medical condition in the termination grievance or any other grievance for the Plaintiff.  (Wood Dep. p.40; Exh. 4)   According to Wood, she did not deal with handicap issues but she referred the Plaintiff to the EAP. (Wood Dep. pp. 60-61; Exh. 4)   Wood did not know if the EAP was used for medical problems.  Wood was not aware of a situation where an employee was referred to the EAP for medical problems.  (Wood Dep. pp. 61-62; Exh. 4)

149.     McDonald did not know whether the Plaintiff mentioned diabetes in her paperwork. (McDonald Dep. p. 11; Exh. 5)  McDonald said that suggestions were made to employees to go to the EAP, but there were no employees ordered to the EAP.  (McDonald Dep. p. 17; Exh. 5) McDonald did not know whether the Plaintiff was referred to the EAP for a medical condition or

any medical reason.  (McDonald Dep. pp. 20-22; Exh. 5)  McDonald was not aware of any employee going to the EAP for medical reasons. (McDonald Dep. p. 24; Exh. 5)

### F.  Defendant's Knowledge of Plaintiff's Handicap/Disability

150.    The Plaintiff always kept Verizon informed of her medical condition. (Miller Dep. p. 40; Exh. 1)  The Plaintiff's supervisor, Sally Sullivan, knew when she was diagnosed, but Judy Corbert was the first person the Plaintiff informed of her diabetes in February of 2000. (Miller Dep. pp. 47-48; Exh. 1)  The Plaintiff told Judy Corbert that she needed to undergo treatment for diabetes. (Miller Dep. pp. 47-49; Exh. 1)  The Plaintiff also had conversations with her supervisor, Sally Sullivan, regarding her diabetes.  But Sally Sullivan would question the Plaintiff's being out sick and act like she was faking it with respect to the Plaintiff's reasons for being out.  She did not believe the Plaintiff. (Miller Dep. pp. 52-56; Exh. 1) The Plaintiff kept her supervisor, Ms. McDonald, informed about her diabetes and diabetes- related conditions. (Miller Dep. pp. 55-58; Exh. 1) The Plaintiff let Hans Peterson, her second level manager, know about her diabetes-related restrictions. (Miller Dep. pp. 112-114; Exh. 1)

151.    McGovern was unaware of any conversations or communications that the Plaintiff had with the Defendant regarding her diabetes.  (McGovern Dep. p.60; Exh. 2)  McGovern doesn't know whether the Plaintiff told her supervisors about her diabetes.  He then said that the Plaintiff's supervisors were aware of specific conversations with the Plaintiff about her diabetes. (McGovern Dep. pp.66-67; Exh. 2)  McGovern reiterated that he was unaware of how or when the Plaintiff's supervisors became aware of her diabetic condition. (McGovern Dep. p. 76; Exh. 2)  McGovern reiterated that the Plaintiff conveyed nothing to the Defendant about her diabetic condition. (McGovern Dep. p. 215; Exh. 2)  McGovern said that the Plaintiff did not make a connection between her diabetes and the gastro-intestinal issues with management. (McGovern Dep. p. 212; Exh. 2)  McGovern said that all that the Plaintiff conveyed to management was

medical conditions for falling down stairs and sore throats. (McGovern Dep. p. 217; Exh. 2)

McGovern said that it could have been only three months before the Plaintiff's termination that

the Defendant became aware of her diabetes. (McGovern Dep. p. 67; Exh. 2)  See also, the facts

set forth in Paragraphs 27, 53, 75, 84 and 86, which are incorporated herein by reference.

152.    Raposa did not know what a "bone fide illness" was, or a "serious medical condition"

under Verizon policy. (Raposa Dep. p. 67; Exh. 3)  Raposa had no knowledge of the Plaintiff's

diabetes but yet it's referred to throughout the grievance she processed. (Raposa Dep. p. 109;

Exh. 3)  Raposa doesn't know whether the Plaintiff's medical condition was related to her

diabetes. (Raposa Dep. pp. 115-116; Exh. 3)  Neither Raposa, nor the other managers to her

knowledge knew of the Plaintiff's diabetic condition at the time of the Plaintiff's termination of

employment. (Raposa Dep. pp.133-134; Exh. 3)  Wood said that she was unaware of any

physical problems that the Plaintiff had while she was an employed at Verizon.  (Raposa Dep. p.

15; Exh. 3)  Wood said that the Plaintiff did not advise her of her diabetes or any other medical

condition as a handicap. (Raposa Dep. p. 15-17; Exh. 3) Wood reviewed the grievance folder just

about a week before her deposition and she said she was unaware that the Plaintiff had diabetes.

(Raposa Dep. pp. 24-25; Exh. 3)

153.    According to McDonald, she never knew that the plaintiff had diabetes.  (McDonald Dep.

p. 8; Exh. 5) According to McDonald, if the diabetes were mentioned in the Plaintiff's

grievances, then management would have knowledge of the diabetes issue.  (McDonald Dep. pp.

35-36; Exh. 5)

The Plaintiff
KATHLEEN MILLER
By Her Attorney
/s/ Michael O. Shea                          Dated: August 2, 2006
MICHAEL O. SHEA, ESQ.
BBO No.: 555474
Law Office of Michael O. Shea, P.C.
451 Main Street
Wilbraham, MA 01095
Telephone No.: (413)596-8005
Facsimile No.: (413)596-8095


## Certificate of Service

    I hereby certify that this document filed through the EDF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 2, 2006, and that there are no non-registered participants.


/s/ Michael O. Shea