UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN MILLER, ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 05-30117-KPN |
| VERIZON COMMUNICATIONS INC., ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE ANY INSTRUCTION, ARGUMENT, OR EVIDENCE ON THE ISSUE OF PUNITIVE DAMAGES AND THE DEFENDANT'S "FINANCIAL CONDITION"**

Defendant Verizon Communications Inc. (Verizon) hereby moves the Court for an Order precluding plaintiff Kathleen Miller ("Ms. Miller") from presenting any evidence or argument in support of a claim for punitive damages. In addition, Verizon requests that the Court reject Plaintiff's request for a jury instruction on punitive damages because the evidence of record in this case, while barely enough to allow Ms. Miller's claims to survive summary judgment, is demonstrably insufficient as a matter of law to support a punitive damages claim under the relevant state and federal standards. Alternatively, to the extent the Court disagrees and determines that the jury should be permitted to consider the issue of punitive damages, Verizon requests an Order prohibiting Ms. Miller from offering any evidence or argument regarding the wealth, size or financial resources of Verizon because such evidence or argument would invite the jury to award damages on an improper basis.

**ARGUMENT**

I. **THE COURT SHOULD RULE AS A MATTER OF LAW THAT ANY CONSIDERATION OF PUNITIVE DAMAGES BY THE JURY IS INAPPROPRIATE BECAUSE NO REASONABLE JURY COULD CONCLUDE THAT PUNITIVE DAMAGES ARE WARRANTED IN THIS MATTER.**

Ms. Miller apparently intends to seek an award of punitive damages because she has proposed a jury instruction on the issue of punitive damages. In this case, an instruction on, and the jury's consideration of, the issue of punitive damages is not warranted because based on the record, no reasonable jury could conclude that Ms. Miller is entitled to an award of punitive damages. Accordingly, the Court should determine that any claim for punitive damages is barred as a matter of law and not permit the jury to consider this issue.[1]

Punitive damages serve different purposes than compensatory damages and are only appropriate in a small subset of cases where "the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mutual Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416, 419 (2003). Under both of Ms. Miller's claimed theories of relief (the ADA and ch. 151B)

---

[1] *See Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 254-55 (1st Cir. 2000)("whether sufficient evidence exists to support punitive damages is a question of law;" holding in ADA discrimination case that District Court properly concluded that consideration of punitive damages "was not warranted given the absence of evidence in the record that defendant engaged in discriminatory practice or practices with malice or reckless indifference to the rights of plaintiffs to be free from intentional discrimination"); *Dartt v. Browing-Ferris Indus., Inc.*, 427 Mass. 1, 17 (1998)(holding in handicap discrimination case under ch. 151B that the issue of punitive damages should not be considered by the jury because there was insufficient evidence as a matter of law to support punitive damages award since there was no admissible evidence that defendant's conduct was outrageous in any respect, even though there was sufficient evidence for the jury to consider whether plaintiff was terminated for his perceived handicap); *see also Braverman v. Penobscot Shoe Co.*, 859 F. Supp. 596, 603-04 (D. Me. 1994)(holding that plaintiff's ADA discrimination claim narrowly survived summary judgment but that the defendants were entitled to partial summary judgment on the issue of punitive damages because the plaintiff had not generated sufficient evidence to create a material dispute of fact that the defendants "intentionally discriminated against him with either malice or reckless indifference to his rights").

in order to warrant consideration of an award of punitive damages, the plaintiff must meet a much higher standard than the standard for imposing liability under those statutes.[2]

Under the ADA, a plaintiff is required to demonstrate not only that an employer engaged in intentional discrimination, but also that they did so with a malicious intent. Specifically, punitive damages are only proper where the evidence demonstrates that an employer engaged in intentional discrimination proscribed by the ADA "with malice or reckless indifference to the federally protected rights of an aggrieved individual." *See* 42 U.S.C. §1981a(b)(1); *Marcano-Rivera*, 232 F.3d at 253-54; *see also Kolstad*, 527 U.S. at 534-46; *cf. Romano v. U-Haul Int'l*, 233 F.3d 655, 668-74 (1st Cir. 2000)(affirming jury award of punitive damages in case where evidence supported finding that employer's managers knew their actions were in violation of federal sex discrimination laws and had attempted to conceal evidence demonstrating knowledge of violation when terminating plaintiff). As the Supreme Court explained in *Kolstad*, the focus of the punitive damages inquiry is on the employer's subjective consciousness that their conduct would violate federal law when taking the action at issue. As such, even an employer's proven intentional discrimination would not give rise to punitive damages liability in circumstances where the employer reasonably believed that its action satisfied a bona fide occupational qualification defense or other statutory exception to liability. 527 U.S. at 536-37. Moreover, under the ADA, an employer cannot held be liable for punitive damages based on the discriminatory acts of its employees or agents when those acts are contrary to the employer's good faith efforts at ADA compliance. *See id.* at 539-46; *Marcano-Rivera*, 232 F.3d at 254.

---

[2] *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)(discussing Congressional intent that the statute which authorizes punitive damages under the ADA, 42 U.S.C. §1981a, imposes a higher standard of proof on plaintiff in order to be eligible for punitive damages award); *Marcano-Rivera*, 232 F.3d at 254 (discussing differing standards of liability for compensatory damages and punitive damages); *Dartt*, 427 Mass. at 17 (ch. 151B punitive damages require higher standard of proof than ch. 151B liability); *see also McKinnon v. Kwong Wah Rest.*, 83 F.3d 498, 507 (1st Cir. 1996)(noting that the legislative history of 42 U.S.C. §1981a demonstrates that Congress intended that plaintiffs "must meet an even higher standard (establishing that the employer acted with malice or reckless or callous indifference to their rights) to recover punitive damages").

Similarly, punitive damages are not appropriate in a Mass. Gen. L. ch. 151B handicap discrimination case unless a plaintiff proffers a higher quantum of proof than that necessary to establish liability for intentional discrimination. A plaintiff must establish that the defendant's conduct is so extreme that it "warrants condemnation and deterrence." *Dartt*, 427 Mass. at 17 (internal quotation and citation omitted). In order for the issue of punitive damages to be submitted to the jury, the Court must determine that there is sufficient evidence from which a jury could reasonably conclude that the defendant's conduct was "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *See Dartt*, 427 Mass. at 17.

In denying in part Verizon's motion for summary judgment, the Court held that the Ms. Miller's evidence of disability discrimination and retaliation was only sufficient to survive judgment as a matter of law "by a slim margin," recognizing that there were very close questions as to certain aspects of the plaintiff's claims, including the question of whether Ms. Miller was even "disabled," and whether regular attendance is an essential function of the job. (Memorandum and Order with Regard to Defendant's Motion for Summary Judgment (Document No. 28), "Summ. J. Op." at 5, 16. Although the evidence of record may be viewed, as the Court did, as minimally sufficient to create disputes of fact as to liability issues that necessitate a trial, that same record evidence also establishes that Verizon did not act with the requisite state of mind to warrant jury consideration of the issue of punitive damages. The Court is already very familiar with the factual issues of this case, having recently decided Verizon's motion for summary judgment. Therefore, Verizon will not recount the factual record in detail. However, the record is devoid of any evidence showing that Verizon acted with evil intent or with the knowledge that it was taking actions that would violate Ms. Miller's rights. Quite to the

contrary, the evidence in the record demonstrates that no reasonable fact-finder could conclude that Verizon acted with "malice or reckless indifference to the federally protected rights of" Ms. Miller or in a manner that was "outrageous, because of the [Verizon's] evil motive or his reckless indifference to" her rights when it terminated her for chronic, unexcused violations of Verizon's attendance policy.  Therefore, the Court should not submit the issue of punitive damages to the jury, or allow evidence relevant to such a claim.

Ms. Miller's intentional discrimination claims rest on the assertion that Verizon terminated her and retaliated against her because of her disability and alleged request for a reasonable accommodation.  Verizon disputes this and asserts that Ms. Miller was terminated because of her history of excessive absenteeism and the failure to correct her attendance problems despite lengthy efforts at progressive (and lenient) corrective discipline and multiple referrals (and eventually a job-assignment) to the Employee Assistance Program ("EAP").  The Court recognized that this was a "strong" argument, noting that Ms. Miller did not dispute that she could not perform the function of "regular attendance" and that her attendance rate was poor, in that she was absent from work (not including vacation time, all of which she took each year) "approximately 10 percent of the time in 1999, 18 percent of the time in 2000, 26 percent of the time in 2001, and 14 percent of the time in 2002." Summ. J. Op. at 16-17, 19.  The Court nonetheless allowed the case to proceed to trial because there were disputes of fact as to: (1) whether Ms. Miller was "substantially limited in the major life activity of eating," and thus disabled; (2) whether the regular attendance Verizon required was an "essential function" of her position; (3) whether accommodations that Ms. Miller purportedly requested were reasonable; and (4) whether Verizon adequately responded to those alleged accommodation requests.  *Id.* at 19.  Nevertheless, it is *undisputed* that Ms. Miller had an extensive history of absences, which

standing alone is a legitimate non-discriminatory reason for the Plaintiff's termination. Although Ms. Miller *now* claims that many of her unexcused absences were due to her diabetes, *see* Summ. J. Op. at 5, and that her absence history was not the real reason for her termination, it is undisputed that Ms. Miller had such a poor attendance record. Summ. J. Op. at 16-17.

Ms. Miller's documented history of poor attendance began long before she was diagnosed with diabetes. Even after her diagnosis, the reasons that Ms. Miller gave for her absences generally were unrelated to diabetes.[3] Moreover, Verizon disciplined Plaintiff for unexcused absences leniently – reducing at least one written warning to a verbal warning, reducing the length of at least one suspension, and allowing several unexcused absences to occur without disciplinary action, even when Verizon would have been entitled to suspend or terminate her. When Verizon did suspend Ms. Miller (which it did on multiple occasions before her termination), the suspensions often were shorter than the attendance policy would have permitted. In fact, after Verizon gave Ms. Miller a ***final warning*** in August 2002 (after which her next unexcused absence could lead to termination), she was absent ***11 more times*** before Verizon finally terminated her employment. Even Ms. Miller's union representative acknowledged Verizon's leniency, and went so far as to comment that Verizon had "bent over backwards to help her."

Moreover, the supervisors whom the Plaintiff deposed, including the Verizon Manager who issued the termination letter, all testified that they were not aware at the time of her termination that Ms. Miller had diabetes. (McDonald Depo., pp. 8-9, 34; Wood Depo, pp. 25, 87-88; Raposa Depo., pp. 133-34, attached hereto as **Exhibit A**.) This further supports Verizon's

---

[3] Ms. Miller explained many of her absences with reasons as varied as being sick, ill, not feeling well, having pulmonary embolism or torn muscle, sore ribs, a problem with her glands, the flu, upset stomachs, migraines, a contagious parasite contracted on vacation, a back injury from falling down stairs, strep throat, sinus problems, and an ovarian cyst. At other times, she gave no reason for her absence. (VER0121-22, attached as Exhibit I to the Defendant's Statement of Undisputed Facts, submitted in support of Verizon's Motion for Summary Judgment.)

position that it would be wholly unreasonable for any jury to conclude that Verizon's actions were motivated by "malice" or a "reckless disregard" for Ms. Miller's rights as an individual who purportedly had a disability. Rather, the undisputed facts of Ms. Miller's poor attendance record and Verizon's leniency in discipline for attendance problems (which *the Plaintiff's union* acknowledged), as well as the deposition testimony of the Plaintiff's supervisors that they did not know that Ms. Miller had diabetes at the time of her termination negates any reasonable inference that Verizon was acting in a malicious way or with reckless disregard for Ms. Miller's rights by finally making the decision to terminate her long after Ms. Miller demonstrated a chronic inability to comply with Verizon's attendance policies.

Ms. Miller also claims that Verizon discriminated against her on the basis of her disability because they failed to provide a reasonable accommodation for her diabetes-related health needs. The Court determined that Ms. Miller had only survived summary judgment "by a thin margin" on the issue of whether regular attendance at her place of work was an "essential function" of her job, but nonetheless allowed the Plaintiff to get to the jury on accommodation issues. *See* Summ. J. Op. at 15-18. As the Court recognized, even if Plaintiff's version of the facts were assumed to be true, she did not request that Verizon accommodate her disability until August or September of 2001, long after her record of attendance problems had resulted in a suspension for excessive absenteeism. Only at that time did she purportedly request modifications to her work schedule which the court found, again construing the facts in the light most favorable to Ms. Miller, included requests to (1) take personal or vacation time instead of sick days, (2) reduce her work schedule so that she could come in late on days that she was ill and (3) switch to part-time employment. *Id.* at 5.

Verizon denies that Ms. Miller adequately informed it of the need for accommodation for a disability or ever requested the accommodations she now claims that she asked for. Nevertheless, as Verizon explained at the summary judgment stage, even had Ms. Miller requested these accommodations, Verizon would have a good faith basis for believing that these accommodations were not reasonable given her position, since they would not allow Ms. Miller to perform the essential functions of her job. *See* Def's Mem. in Supp. of Mot. for Summ J. at 12-15. Thus, even though the Court found it should be left to the jury to conclude ultimately whether these accommodation requests were adequately made and whether they were reasonable, the record demonstrates that Verizon would have had genuine good faith concerns about Ms. Miller's ability to perform her job even with these alleged requests for accommodations, especially in light of Ms. Miller's previous attendance history.

Additionally, the record demonstrates that while Verizon did not provide the type of accommodations that Ms. Miller now claims she allegedly requested, Verizon did make good faith attempts to engage in an interactive process with Ms. Miller to help her find an accommodation, which she repeatedly rebuffed. As the Court found at summary judgment, Verizon requested that Ms. Miller contact Verizon's Employee Assistance Program ("EAP"). *See* Summ. J. Op. at 5. At one point, Ms. Miller was even "job assigned" to the EAP in January 2002, with the assent of her union. Nevertheless, Ms. Miller continuously refused to engage the EAP in any attempt to eliminate her attendance problems. *See* Summ. J. Op. at 5. As the Court recognized, Ms. Miller does not dispute that Verizon attempted to make these referrals, but rather claims that EAP was an inappropriate vehicle to respond to her disability needs and thus did not constitute a "reasonable accommodation." *Id.* at 18. Although this dispute is one the Court determined that the jury must resolve, Verizon's repeated attempts to refer Ms. Miller to

EAP in order to obtain assistance, which she ignored, demonstrate that Verizon was not acting with malice or a reckless disregard of Ms. Miller's rights when it finally terminated her after years of poor attendance.

In summary, based on the evidence of record in this case, no reasonable jury could conclude that Verizon's conduct – even if such conduct could subject Verizon to liability under ch. 151B or the ADA – reached the level of culpability that must be shown in order for an award of punitive damages to be appropriate. Accordingly, the Court should deny Ms. Miller's request for a jury instruction on the issue of punitive damages and preclude any argument or testimony related to the issue of punitive damages to go to the jury.[4]

## II. ANY JURY INSTRUCTION, EVIDENCE OR ARGUMENT REGARDING VERIZON'S "FINANCIAL POSITION" SHOULD BE PRECLUDED BECAUSE IT WOULD INVITE THE JURY TO AWARD DAMAGES ON AN IMPROPER BASIS.

Ms. Miller has requested in her proposed jury instructions that the jury should consider "the financial position of Verizon" in reaching a decision on punitive damages. Verizon objects to such an instruction and to the introduction of any evidence and any argument by counsel regarding the so-called "financial position" of Verizon, including, without limitation, Verizon's net worth, earnings, profits, size, or any other financial indicators regarding Verizon on the grounds that such evidence is both irrelevant and prejudicial.

As an initial matter, for the reasons set forth above, there is insufficient evidence from which any reasonable fact-finder could conclude that Verizon's conduct rose to the reprehensible level that would warrant consideration of the punitive damages issue at all. Accordingly, any

---

[4] Although Verizon believes it is clear as a matter of law at this stage that punitive damages are not warranted in this case, to the extent that the Court determines that it should defer consideration of the appropriateness of the Plaintiff's request for punitive damages until after the Plaintiff has presented her evidence, Verizon respectfully requests that the Court order that Plaintiff's counsel not make reference to punitive damages or offer evidence that could only be relevant to the issue of punitive damages until the Court has considered and ruled on this motion.

evidence of Verizon's "financial position" would be wholly irrelevant and should be excluded. *See* Fed. R. Evid. 401, 402.

Moreover, even if the issue of punitive damages goes to the jury, evidence of Verizon's "financial position," should not be permitted. Verizon respectfully submits that because the Plaintiff's claim for punitive damages is extraordinarily weak – even weaker than the inferences that allowed Ms. Miller's claims to survive summary judgment "by a slim margin" – any reference to the wealth or financial position of Verizon would unduly prejudice the jury and make it likely that the jury will inflate the amount of compensatory damages, if awarded, because of potential biases against large corporations or because the jury views Verizon as a "deep pocket" defendant. *See* Fed. R. Evid. 403. Even in cases where the jury properly considers punitive damages awards, several courts, including the Supreme Court, have emphasized their concern that "the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses." *See State Farm*, 538 U.S. at 417 (*quoting Honda Motors Co. v. Oberg*, 512 U.S. 415, 432 (1994)); *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 464 (plurality opinion)(agreeing with the defendant that the emphasis on the defendant's wealth in both the court's instructions on and counsel's argument on punitive damages "increased the risk that the award may have been influenced by prejudice against large corporations" but refusing to consider the issue further because it was not properly raised at state court level); *id.* at 489-95 (O'Connor, J., dissenting)(would hold that the disproportionately large punitive damages award in the case was most likely caused by the fact that the jury was unduly influenced by the wealth and out of state status of the defendant, which was reinforced by the court's instructions to consider the issue of wealth and counsel's repeated arguments regarding the defendant's wealth); *see also Zazu*

*Designs v. L'Oreal, S.A.*, 979 F.2d 499, 508-09 (7th Cir. 1992)(corporation's net worth should not be the basis for determining appropriate amount of punitive damages against it because the "net worth" does not actually belong to the corporate entity, but rather its investors, and corporate assets are unrelated to the injury done to the victim or the size of award necessary to ensure that corporate managers obey the law); *Pivot Point Int'l, Inc. v. Charlene Products, Inc.*, 932 F.Supp. 220, 223 (N.D. Ill. 1996)(evidence of defendant's financial information, which plaintiff claimed was relevant to punitive damages claim, should be excluded because it "has … [the] potential to distract the jury from the essential issues of the case.").

Accordingly, even in the event that the Court determines that the issue of punitive damages is appropriate for the jury's consideration, Verizon respectfully requests that the Court refuse Plaintiff's request for an instruction that the jury may consider Verizon's "financial condition" in making their determination on punitive damages. In addition, Verizon moves to preclude Ms. Miller from offering any evidence of Verizon's "financial condition" at trial, including, without limitation, evidence concerning Verizon's net worth, earnings, profits, size, or any other financial indicators.

## CONCLUSION

For the foregoing reasons, Verizon respectfully requests that the Court bar any jury consideration of the issue of punitive damages, including any evidence of Verizon's "financial condition."

VERIZON COMMUNICATIONS, INC.
By its Attorneys,


 /s/ Windy Rosebush Catino
Timothy P. Van Dyck  (BBO #548347)
Windy Rosebush Catino (BBO #636962)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199
(617) 239-0100


**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be served electronically upon the registered participants as identified on the Notice of Electronic Filing (NEF) on March 19, 2007, and that there are no non-registered participants.


/s/ Windy Rosebush Catino
Windy Rosebush Catino (BBO #636962)

```
00001
 1                    UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF MASSACHUSETTS
 3
 4
 5
 6          * * * * * * * * * * * * * * *
 7          KATHLEEN MILLER,            *
 8                           Plaintiff  *
 9          vs.                         * No. 05-30117-KPN
10          VERIZON COMMUNICATIONS, INC., *
11                           Defendant  *
12          * * * * * * * * * * * * * * *
13
14
15              DEPOSITION OF:  DEBORAH L. McDONALD
16                    CATUOGNO COURT REPORTING
17                         1414 Main Street
18                     Springfield, Massachusetts
19                          March 29, 2006
20                     (5:00 p.m. to 5:35 p.m.)
21
22
23                       Tacy A. Malandrinos
24                          Court Reporter
```

```
 1          APPEARANCES:
 2          Representing the Plaintiff:
 3          LAW OFFICES OF MICHAEL O. SHEA, P.C.
 4          451 Main Street
 5          Wilbraham, MA 01095
 6          BY:  MICHAEL O. SHEA, ESQ.
 7          (413) 596-8005
 8          fax (413) 596-8095
 9
10          Representing the Defendant:
11          EDWARDS, ANGELL, PALMER & DODGE LLP
12          111 Huntington Avenue
13          Boston, MA 02199
14          BY:  WINDY L. ROSEBUSH, ESQ.
15          (617) 239-0100
16          fax (617) 227-4420
17          wrosebush@eapdlaw.com
18
19
20
21
22
23
24
```

3/29/2006 Deborah McDonald

```
1      A.   I don't know why she was
2  terminated.
3      Q.   Well, do you know who was involved
4  in the decision to terminate her employment?
5      A.   I never knew why she was
6  terminated, so I don't know how to answer this
7  question any further.
8      Q.   You could say I don't know.
9      A.   I don't know.
10     Q.   At some point did you learn that
11 Ms. Miller had diabetes?
12     A.   No.
13     Q.   Could she have mentioned it to you
14 but you just don't recall?
15          MS. ROSEBUSH:  Objection.
16          THE WITNESS:  She never told me
17     she had diabetes.
18     Q.   (By Mr. Shea)  And you are certain
19 of that?
20     A.   Yes.
21     Q.   Did she ever tell you she had any
22 medical problem?
23     A.   I don't remember.
24     Q.   Was she ever out for any medical
```

3/29/2006 Deborah McDonald

```
1  problems?
2           MS. ROSEBUSH:  Objection.
3           THE WITNESS:  She was out.  Called
4      in sick.  I don't know off the top of my
5      head what she said the reason was.
6      Q.   (By Mr. Shea)  So you never had any
7  conversations with her about diabetes?
8           MS. ROSEBUSH:  Objection.
9           THE WITNESS:  None.
10     Q.   (By Mr. Shea)  And do you know
11 whether anyone else at Verizon, managers in her
12 location, had any conversations with her about
13 diabetes?
14          MS. ROSEBUSH:  Objection.  Lacks
15     foundation.
16          THE WITNESS:  I don't know.
17     Q.   (By Mr. Shea)  Did Verizon have a
18 progressive discipline policy related to
19 attendance?
20     A.   Yes.
21     Q.   Do you recall what it was?
22     A.   I believe the first occasion of
23 absence was a conversation with the employee
24 explaining the attendance policy.  The next
```

```
 1   everything you remember about your involvement
 2   in those processes?
 3            MS. ROSEBUSH:  Objection.  She
 4       hasn't been asked everything she
 5       remembers.
 6       Q.   (By Mr. Shea)  Can you tell me
 7   everything you know about it?
 8       A.   About grievances?
 9       Q.   About the grievances you were
10   involved in relating to Kathleen Miller?
11       A.   I don't remember.
12       Q.   Do you remember whether she raised
13   diabetes as a medical reason?
14       A.   She never ever told me she had
15   diabetes.
16       Q.   Did she ever say that to union
17   representatives, do you know?
18            MS. ROSEBUSH:  Objection.
19            THE WITNESS:  I never heard that.
20       I told you before, she never told me that.
21       Q.   (By Mr. Shea)  Would it surprise
22   you to learn that it is referenced in the
23   grievance fact sheet, diabetes?  Would it
24   surprise you?
```

00001
1                UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF MASSACHUSETTS
3
4
5
6        * * * * * * * * * * * * * *
7        KATHLEEN MILLER,            *
8                      Plaintiff    *
9        vs.                         * No. 05-30117-KPN
10       VERIZON COMMUNICATIONS, INC., *
11                     Defendant    *
12       * * * * * * * * * * * * * *
13
14
15            DEPOSITION OF:  PAULA J. RAPOSA
16               CATUOGNO COURT REPORTING
17                    1414 Main Street
18                Springfield, Massachusetts
19                     March 29, 2006
20
21
22                 Tacy A. Malandrinos
23                    Court Reporter
24              (10:00 a.m. to 4:50 p.m.)

1    APPEARANCES:
2    Representing the Plaintiff:
3    LAW OFFICES OF MICHAEL O. SHEA, P.C.
4    451 Main Street
5    Wilbraham, MA 01095
6    BY:  MICHAEL O. SHEA, ESQ.
7    (413) 596-8005
8    fax (413) 596-8095
9
10   Representing the Defendant:
11   EDWARDS, ANGELL, PALMER & DODGE LLP
12   111 Huntington Avenue
13   Boston, MA 02199
14   BY:  WINDY L. ROSEBUSH, ESQ.
15   (617) 239-0100
16   fax (617) 227-4420
17   wrosebush@eapdlaw.com
18
19
20
21
22
23
24

3/29/2006 Paula Raposa

1    written warning letters prior to being involved
2    in the decision making process to terminate
3    Kathleen Miller's employment at Verizon?
4         A.    Not recalling what was actually
5    done at the time. It was three years ago. We
6    talked about this earlier. I would only tell
7    you it would be normal to look at the documents
8    of her written warnings leading up to that and
9    her past attendance as to the past year and what
10   steps she was on and that kind of thing.
11        Q.    Turning to Exhibit 15. Would you
12   do that for me please. I will give you a minute
13   to look at that and just tell me if you
14   recognize that document?
15        A.    I do not recognize the document.
16              I have seen such notations. I
17   would go from the actual 1477 for notations.
18        Q.    As of the time that Kathleen
19   Miller's employment was terminated, were you
20   ever aware that she had a diabetic condition?
21        A.    No.
22        Q.    To your knowledge was any manager
23   at Verizon aware of it?
24              MS. ROSEBUSH: Objection. Lacks

3/29/2006 Paula Raposa

1    foundation.
2              THE WITNESS: I only can speak for
3              myself. I did not know.
4         Q.    (By Mr. Shea) But did anyone tell
5    you that they knew or indicate in any way that
6    they knew?
7         A.    No. And to answer that, if someone
8    had told me then I would have known.
9         Q.    If a union member knew as part of
10   the grievance process that she filed that she
11   had a diabetic condition would the managers at
12   Verizon know?
13             MS. ROSEBUSH: Objection.
14        Q.    (By Mr. Shea) Who were involved in
15   that grievance process?
16             MS. ROSEBUSH: Objection.
17             THE WITNESS: Your question does
18             not make sense to me because you are
19             asking me if someone knew something what
20             would they do or say. I can't answer
21             that.
22        Q.    (By Mr. Shea) Do you know what
23   managers at Verizon were involved in any and or
24   every grievance process that Kathleen Miller

3/28/2006  Mary Ellen Wood

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3
 4
 5
 6      * * * * * * * * * * * * * *
 7      KATHLEEN MILLER,          *
 8                     Plaintiff  *
 9      vs.                       * No. 05-30117-KPN
10      VERIZON COMMUNICATIONS, INC., *
11                     Defendant  *
12      * * * * * * * * * * * * * *
13
14
15          DEPOSITION OF:  MARY ELLEN WOOD
16             CATUOGNO COURT REPORTING
17                  1414 Main Street
18              Springfield, Massachusetts
19                   March 28, 2006
20              (4:43 p.m. to 6:45 p.m.)
21
22               Tacy A. Malandrinos
23                  Court Reporter
24
```

3/28/2006  Mary Ellen Wood

```
 1   APPEARANCES:
 2   Representing the Plaintiff:
 3   LAW OFFICES OF MICHAEL O. SHEA, P.C.
 4   451 Main Street
 5   Wilbraham, MA 01095
 6   BY:  MICHAEL O. SHEA, ESQ.
 7   (413) 596-8005
 8   fax (413) 596-8095
 9
10   Representing the Defendant:
11   EDWARDS, ANGELL, PALMER & DODGE LLP
12   111 Huntington Avenue
13   Boston, MA 02199
14   BY:  WINDY L. ROSEBUSH, ESQ.
15   (617) 239-0100
16   fax (617) 227-4420
17   wrosebush@eapdlaw.com
18
19
20
21
22
23
24
```

```
 1  probably two weeks ago that I looked at it.
 2       Q.   Just so I'm clear on this, is it
 3  fair to say in your mind that you did not know
 4  that Kathleen Miller had diabetes at the time of
 5  her termination of employment?
 6       A.   That would be correct.
 7       Q.   Do you know whether any managers
 8  knew whether she had diabetes at the time of her
 9  termination of employment?
10            MS. ROSEBUSH:  Objection.  Lacks
11  foundation.
12       Q.   (By Mr. Shea)  Do you know?
13       A.   I would not know that.
14       Q.   Do you know that?
15       A.   I don't, no.
16       Q.   Does Verizon have a document or
17  form that is entitled Meeting Report?  Does that
18  sound familiar to you?
19       A.   Yes.
20       Q.   What is that document?
21       A.   It would be a data base that
22  managers would put notes in of conversations
23  that they had with employees and coaching
24  sessions that they might have had with
```

3/28/2006 Mary Ellen Wood

1  or what the issue was.
2       Q.   Prior to the termination of
3  employment, did anyone bring to your attention
4  any medical problems that she was having other
5  than what you testified to earlier which were
6  the -- I can't recite them off the top of my
7  head, but there was a falling down the stairs?
8            MS. ROSEBUSH:  Objection.  She
9       testified at least twice that she doesn't
10      know her medical history and the issue of
11      falling down the stairs was from the prior
12      deposition.
13           THE WITNESS:  I have no knowledge
14      of that either.
15      Q.   (By Mr. Shea)  So no knowledge of
16 any medical history with respect to Kathleen
17 Miller prior to her termination?
18      A.   No.
19      Q.   What about today?
20           MS. ROSEBUSH:  Objection.
21      Q.   (By Mr. Shea)  Are you aware of any
22 medical condition she had sitting here today?
23      A.   Sitting here today I have heard
24 diabetes thrown out about fifty times so I am

3/28/2006 Mary Ellen Wood

1  assuming she had diabetes.
2       Q.   But before this deposition here
3  today --
4       A.   No, not that I recall.
5       Q.   You heard nothing about diabetes?
6       A.   I want to say I don't recall if it
7  was mentioned at a grievance meeting or not.  It
8  could have been.  I don't know what her issue
9  was.
10      Q.   And you don't remember hearing
11 about any other medical conditions at any
12 grievance meeting prior to today?
13      A.   No.  And I would say if somebody
14 gives me hearsay at a grievance meeting, I can't
15 hold any water to it because I do not look at
16 medical documentation.  That's done by the FMLA
17 department and they would make the decisions on
18 that.
19           I'm not medically certified to make
20 a medical ruling.
21      Q.   I understand that and I'm just
22 asking you what you heard about any medical
23 condition from the date of termination prior to
24 today, other than my referring to it in the